532 So.2d 876 (1988)
Kenneth W. EWING, et al
v.
Clinton C. AUBERT, M.D., et al.
Nos. CA 87 0942, CA 87 0943.
Court of Appeal of Louisiana, First Circuit.
October 12, 1988.
*877 Alfred W. Speer, Baton Rouge, for plaintiff-appellant Kenneth Ewing, Laura Ann Ewing, Tamara Lyn Ewing and Troy E. Ewing.
William R. Carruth, Baton Rouge, for intervenor-appellee Com'r of Ins. of the State of La.
Donald S. Zuber, Baton Rouge, for defendant-appellee Woman's Hosp. Foundation.
Robert L. Kleinpeter, Baton Rouge, for defendant-appellee Clinton C. Aubert, M.D. St. Paul Fire and Marine Ins.
Before LOTTINGER, CARTER and FOIL, JJ.
FOIL, Judge.
These consolidated cases involve a wrongful death action brought by the surviving spouse and five children of Margaret Ewing, as well as an action for damages suffered by the youngest child, Troy Ewing. Mrs. Ewing was admitted to Woman's Hospital in East Baton Rouge Parish on February 9, 1979, at which time she was in labor for the birth of her fifth child. Approximately eleven hours later, her uterus ruptured and she suffered a massive amniotic fluid embolism. Shortly thereafter, Troy Ewing was delivered in very poor condition by emergency cesarean section. After unsuccessful resuscitation efforts, Mrs. Ewing was pronounced dead. Today, as a result of suffering severe anoxic brain damage prior to his birth, Troy Ewing is a spastic quadriplegic with cerebral palsy, who has difficulty swallowing and has severe cognitive, motor and language deficits.
Kenneth W. Ewing, individually and as tutor of his minor children, filed suit against Dr. Clinton C. Aubert, Mrs. Ewing's obstetrician; Dr. Debyani Mehta, the anesthesiologist; and Woman's Hospital Foundation for the wrongful death of Margaret Ewing. A second suit was also filed by Mr. Ewing, as natural tutor of Troy Ewing, against the same defendants for the damages suffered by Troy. The wrongful death and personal injury suits were later consolidated.
*878 As Dr. Aubert is a qualified health care provider under the Louisiana Patients Compensation Fund Act, a medical review panel was convened which found that Dr. Aubert's actions failed to comply with the appropriate standard of care and he was thus at fault in this case. Plaintiffs subsequently received the statutory limit of $500,000.00 ($100,000.00, which was deposited into the registry of the court by Dr. Aubert's insurer, St. Paul Fire & Marine Insurance Company, plus $400,000.00 from the Patients Compensation Fund) for their claims against Dr. Aubertnamely, the wrongful death claim and Troy Ewing's claim for general damages. Dr. Debyani Mehta was voluntarily dismissed by plaintiffs from both suits.
Thereafter, a trial by jury was held in this matter against the remaining defendant, Woman's Hospital, from August 11, 1986, through August 22, 1986. By a vote of 11-1, the jury returned a verdict finding that the hospital was not negligent. From a judgment signed in compliance therewith, Mr. Ewing and three of his children perfected this appeal.
We affirm.
FACTS
In the early morning hours of February 9, 1979, Margaret Ewing was admitted to Woman's Hospital in labor with her fifth child. It was to be her fourth delivery, as she previously gave birth to twins. She was observed for approximately two hours and, upon formal admittance, came under the primary care of Nurse Judy Bongiovanni. At 7:40 a.m., as per the orders of Mrs. Ewing's obstetrician, Dr. Clinton C. Aubert, Nurse Bongiovanni began the administration of an oxytocic agent, Pitocin, to Mrs. Ewing. This synthetic hormone is designed to stimulate uterine contractions, and is adjusted (increased or decreased) according to the nurse's assessment of the quality of the patient's contractions. A nurse at Woman's Hospital was required to begin the drip of Pitocin at 4 drops per minute and, in her discretion, could increase the dosage to a maximum of 32 drops per minute if she felt this was justified to establish a good labor pattern. By 8:00 a.m., Nurse Bongiovanni had increased the dosage of Pitocin to 12 drops per minute.
Dr. Aubert examined Mrs. Ewing at 8:40 a.m. for the first time that day, and found that her cervix was dilated 2 centimeters. During the morning hours, either Nurse Bongiovanni or a student nurse monitored Mrs. Ewing's blood pressure approximately every hour and the fetal heart tones (FHTs) approximately every 30 minutes, as was required by hospital standards for a patient receiving Pitocin. At 11:00 a.m., Mrs. Ewing was beginning to feel discomfort with contractions, and discussed her anesthesia options with an anesthesiologist, Dr. Debyani Mehta.
After performing a vaginal examination on Mrs. Ewing at 12:20 p.m., Nurse Bongiovanni charted that her cervix was dilated 3-4 centimeters, was thick and becoming more anterior. Dr. Aubert examined the patient at 1:00 p.m. and found her cervix was dilated 4-5 centimeters. At 1:15 p.m., Dr. Mehta began administering anesthesia to Mrs. Ewing. A caudal catheter was inserted and injected, but was ineffective due to back problems suffered by Mrs. Ewing. An epidural catheter was then inserted and injected, which seemed to provide satisfactory results. At 2:00 p.m., Nurse Bongiovanni charted that Mrs. Ewing was then receiving Pitocin at the rate of 14 drops per minute.
At a 2:15 p.m. vaginal examination of Mrs. Ewing by Dr. Aubert, it was noted that her cervix was dilated 8-9 centimeters. Nurse Bongiovanni charted that she was "encouraged to push with contractions" and that she was comfortable with the contractions. Following a 2:45 p.m. examination by Nurse Bongiovanni, she charted that Mrs. Ewing was "pushing with contractions" and was "becoming uncomfortable with contractions." When a CRNA, Mr. David Chewning, attempted to reinject Mrs. Ewing's epidural catheter with more anesthesia, it was discovered that the catheter had become dislodged.
During the afternoon hours, Mrs. Ewing's blood pressure was charted only at *879 12:25 p.m. and 2:15 p.m. FHTs were charted five times, the last of which was at 2:45 p.m. After a 3:15 p.m. vaginal examination by Nurse Bongiovanni, with Dr. Aubert in attendance, the patient's cervix remained dilated 8-9 centimeters and she remained uncomfortable with contractions. Dr. Aubert then left the hospital and went home. Dr. Mehta saw Mrs. Ewing shortly thereafter, and a decision was made to discontinue efforts at regional anesthesia and to use general anesthesia. Accordingly, at 3:40 p.m., Mrs. Ewing was given the drugs Demerol, Scopolamine and Largon. Mrs. Ewing was then moved to the late labor room at Woman's Hospital.
Nurse Bongiovanni performed a final vaginal examination on Mrs. Ewing at 3:45 p.m., and charted that her cervix had dilated to a rim. She notified Dr. Aubert by telephone of the patient's condition, at which time the doctor ordered that a pelvimetry x-ray be taken at 4:00 p.m. if the patient's condition had not changed by that time.
The following events occurred very rapidly and not necessarily in this order. They were charted by nurse Nancy Tonguis after their occurrence. In late labor, nurse Tonguis examined Mrs. Ewing, but did not chart her findings as she became quite busy. At approximately 3:50 p.m., as she was examining the patient in the next bed, she heard Mrs. Ewing cough. When she went to her, she noticed Mrs. Ewing had vomited a small amount and appeared apneic for 20-30 seconds. When Mrs. Ewing began breathing again, her color was pale and she stated that she was nauseated. Nurse Tonguis turned her to her left side, at which time Mrs. Ewing became incoherent and uncooperative and began thrashing in the bed. The nurse was unable to find her blood pressure. Anesthesia personnel began resuscitation measures. Dr. Mehta was unable to palpate a maternal pulse or obtain a blood pressure reading. FHTs dropped very low and then became imperceptible. Dr. Aubert was notified and arrived at the hospital in approximately ten minutes, at which time he delivered a baby boy by emergency cesarean section. The baby, Troy Ewing, had a 1-2 apgar, which is an assessment of the child's health at birth. Resuscitative efforts on Mrs. Ewing continued for about an hour, when they were stopped and she was pronounced dead. As there was never any sign of life in Mrs. Ewing after 3:53 p.m., she apparently died immediately from a massive amniotic fluid embolism caused by a rupture of her uterus. Troy Ewing suffered fetal anoxia as a result of his mother's death.
SPECIFICATIONS OF ERROR
On appeal, plaintiffs urge the following assignments of error:
(1) The jury committed manifest error in its determination that Woman's Hospital exercised the standard of care ordinarily exercised by such facilities actively practicing under similar facts and circumstances.
(2) The jury committed manifest error in failing to find that plaintiffs had proven by a preponderance of the evidence that the failure by Woman's Hospital to exercise the standard of care ordinarily exercised by such facilities actively practicing under similar facts and circumstances was a legal cause of the death of Margaret Ewing and the damage suffered by Troy Ewing.
(3) The jury committed manifest error in failing to award Kenneth W. Ewing, Laura Ann Ewing, Tamara Lyn Ewing and Troy Edward Ewing the compensation for their damages which were proven at trial.
As we disagree with assignment of error number one, thus affirming the judgment of the trial court, we pretermit discussion of numbers two and three.
LIABILITY
Plaintiffs contend that Woman's Hospital is liable for the negligent acts of its nurse employee, Judy Bongiovanni, in failing to exercise the requisite standard of care as established by hospital policy and procedures. Specifically, plaintiffs claim that Nurse Bongiovanni failed to meet the standards of her employer and her profession *880 in her care of Mrs. Ewing and her baby in the following four instances:
(1) Nurse Bongiovanni's decision to increase the Pitocin drip from 12 to 14 drops per minute at 2:00 p.m.;
(2) The facts that, at 2:15 p.m., Mrs. Ewing was "encouraged to push" and, at 2:45 p.m., she was "pushing with contractions";
(3) Nurse Bongiovanni's failure to assess the arrest of Mrs. Ewing's labor; and
(4) Nurse Bongiovanni's failure to discontinue the Pitocin drip in the face of Mrs. Ewing's arrested labor.
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require, and to protect the patient from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each particular case. Smith v. State Department of Health and Human Resources Administration, 523 So.2d 815, 819 (La.1988). Hospitals, like all other employers, may be held liable for the negligent conduct of its employees, including nurses, committed while acting in the course and scope of their employment under the doctrine of respondeat superior. Daniel v. St. Francis Cabrini Hospital of Alexandria, Inc., 415 So.2d 586, 589 (La.App.3d Cir.1982); Wells v. Woman's Hospital Foundation, 286 So. 2d 439, 444 (La.App. 1st Cir.1973), writ denied, 288 So.2d 646 (La.1974). A nurse who practices her profession in a particular specialty service, such as labor and delivery, owes to her patients the duty of possessing the degree of knowledge and skill ordinarily possessed by members of her profession actively practicing in such a specialty service under similar circumstances. It is a nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing profession in good standing who practice their profession in the same specialty service, and to use reasonable care and diligence, along with her best judgment, in the application of his or her skill to the case. See Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La. 1978); Novak v. Texada, Miller, Masterson and Davis Clinic, 514 So.2d 524, 526 (La. App.3d Cir.), writ denied, 515 So.2d 807 (La.1987); Daniel, supra, at 590.
It is well settled that an appellate court must give great weight to the conclusions reached by the trier of fact and, if there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed unless manifestly erroneous. Novak, supra, at 525; Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1184 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La. 1986).
In the instant case, two expert physicians, Drs. Dean Cromartie and Jack Schneider, and two expert labor and delivery nurses, Patricia Wagner and Joanne Jones, testified for the plaintiffs. Each gave their opinion with respect to the first alleged instance of negligence by Nurse Bongiovanni, namely, her decision to increase the Pitocin from 12 to 14 drops. Dr. Cromartie testified that, since Mrs. Ewing's labor was progressing, there was no sensible reason to increase the Pitocin. Dr. Schneider stated that there was such a remarkable change in the dilation of Mrs. Ewing's cervix from 4 to 8-9 centimeters in 45 minutes, the nurse should have been decreasing or stopping the Pitocin, if anything. He further stated, however, that an increase of Pitocin is warranted when the level of the patient's contractions has not reached a desirable quality. All four of plaintiff's experts agreed that there is insufficient information in the medical records disclosing the basis for Nurse Bongiovanni's decision.
The next instance of alleged negligence on the nurse's part are the two chart notations *881 concerning pushing by Mrs. Ewing. As respects the 2:15 p.m. notation, "encouraged to push", Drs. Cromartie and Schneider both stated that a doctor might ask a patient to push once in an examination to see if the cervix might retract fully. Nurse Wagner testified that she would not chart "encouraged to push" if it was only requested of the patient one time during a vaginal examination. With respect to the 2:45 p.m. notation, "pushing with contractions", Dr. Cromartie testified that it was inappropriate to continue pushing at 8-9 centimeters, and Dr. Schneider stated that the entry should have read "discouraged from pushing" or "asked not to push." Nurse Wagner testified that if she wanted the patient to push, she would chart "pushing with contractions."
The third alleged negligent act by Nurse Bongiovanni is her failure to assess the arrest of Mrs. Ewing's labor. Dr. Cromartie merely concluded that there was an arrested descent of the presenting part of the fetus, and there was no charting of the station of descent. Dr. Schneider, however, noted that Nurse Bongiovanni performed three vaginal examinations on Mrs. Ewing after 2:15 p.m., at which time the doctor's operative note indicated that the vertex was still high. The doctor's operative note at 3:45 p.m. ordered a pelvimetry x-ray at 4:00 if there was no descent, so he must have received information regarding the station of the child from the nurse. Nurse Wagner's testimony included essentially the same conclusion.
Nurse Wagner testified that Nurse Bongiovanni should have turned off the Pitocin drip in the face of cephalopelvic disproportion, which supports plaintiff's final allegation of nursing negligence. Nurse Jones made the same statement, except she further testified that a physician must diagnose CPD and decide to stop the Pitocin drip.
In opposition to plaintiff's four experts, defendant Woman's Hospital Foundation offered the testimony of four experts in the field of obstetrics-gynecology: Dr. Clinton Aubert, Mrs. Ewing's obstetrician; and the three physicians who served on the Medical Review Panel which reviewed the case against Dr. Aubert, Dr. Joseph Broyles, Dr. Clifford Schwartzenberg, and Dr. Robert DiBenedetto.
Drs. Broyles, Schwartzenberg, and Di-Benedetto agreed that the increase of Pitocin by 2 drops is insignificant and unrelated to Mrs. Ewing's uterine rupture. Dr. Aubert testified that if an increase in Pitocin is too much, it will be manifested very soon after raising it. Mrs. Ewing's uterus did not rupture for approximately two hours after the Pitocin was increased.
Dr. Aubert testified that he does not remember giving the 2:15 p.m. order for Mrs. Ewing to push. He stated that there are probably only two conditions under which you would order a patient to push under Mrs. Ewing's circumstances, which are to try to push the cervix back or to see if there is any descent of the presenting part. Dr. Schwartzenberg testified that you often have a patient push to see if you can slide the cervix over the baby's head. Drs. Broyles, Schwartzenberg, and DiBenedetto all testified that, concerning the 2:45 p.m. notation "pushing with contractions", it is quite common and a natural reaction for a patient to push involuntarily when contractions become painful.
All four of defendant's experts agreed that it is not a nurse's job to diagnose arrest of labor. They all believed that making a diagnosis invades the function of the physician. Dr. DiBenedetto stated that a nurse tells the doctor observable facts, then the doctor makes a conclusion on the diagnosis of arrest. Dr. Schwartzenberg pointed out that it is a retrospective view that Mrs. Ewing's labor arrested, and arrest would have been difficult to assess at the time it occurred.
Finally, Dr. Broyles testified that, had it been decided that an arrest pattern caused by cephalopelvic disproportion was underway, the Pitocin drip should have been discontinued. However, at 3:15 p.m., which was the last time Dr. Aubert was present during a vaginal exam of Mrs. Ewing, if any reason to discontinue the Pitocin existed, it was the doctor's responsibility to do so.
*882 This Court has carefully reviewed the lengthy trial transcript and other exhibits introduced at trial, and concludes that plaintiffs failed to prove that the hospital, through its employee, was negligent. Although there are some differences in the opinions of the medical experts presented, there was sufficient competent testimony upon which the trier of fact could reasonably base its factual conclusions. Thus, we cannot say that the jury was manifestly erroneous in the verdict it returned.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the plaintiffs.
AFFIRMED.