975 So.2d 666 (2008)
Jacqueline LITTLE, Cynthia Little Cameron and Mark S. Little, Plaintiffs-Appellants,
v.
Dr. David G. POU and Christus Health Northern Louisiana d/b/a Christus Schumpert Health System, Defendants-Appellees.
No. 42,872-CA.
Court of Appeal of Louisiana, Second Circuit.
January 30, 2008.
Rehearing Denied March 13, 2008.
*668 Donald Brown, Anthony J. Bruscato, Monroe, for Appellants.
Rountree & Guin by Gordon E. Rountree, Shreveport, for Appellee, David G. Pou, M.D.
Mayer, Smith & Roberts by Mark A. Goodwin, Shreveport, for Appellee, Christus Health Northern Louisiana d/b/a Christus Schumpert Health System.
Before BROWN, STEWART and CARAWAY, JJ.
CARAWAY, J.
A wrongful death action was instituted against a doctor and hospital after the death of a patient who was hospitalized due to complications from sinus surgery. After three nights in the hospital, the decedent had just returned home when he died from blood clots in his lungs caused by deep vein thrombosis ("DVT"). The wife and children of the decedent sued for medical malpractice relating to the failure of the doctor and nursing staff to take the proper actions to test for and prevent the DVT during the patient's period of immobilization following surgery. The doctor was dismissed on summary judgment, and the hospital received a favorable jury verdict dismissing the action. From these judgments, plaintiffs appeal. Finding no *669 manifest or legal error in the judgments, we affirm.

Facts
Dr. David Pou performed outpatient sinus surgery on Henry Little on Friday, January 8, 1999 at Christus Schumpert Health System Hospital ("Schumpert") in Shreveport. During the procedure, a known risk of surgery, the puncture of the cerebral dura, occurred. This complication required Little's hospitalization over the weekend due to the risk of infection.
Initially, strict bed rest was prescribed. By Sunday, January 10, Little was given bathroom privileges. He was released Monday to travel home to West Monroe.
During the drive home, Little began complaining of leg cramps. In an apparent attempt to relieve his symptoms, Little soaked in a hot bath. As his wife assisted him in getting out of the tub, Little collapsed. He was rushed to a Monroe hospital where he died of an apparent heart attack. A later autopsy report revealed that Little suffered bilateral pulmonary emboli (blood clots in his lungs) caused by DVT.
Evidence contained in the record shows that DVT develops when the same clotting pattern that stops external bleeding occurs in the deep veins located in the arms, legs and pelvic area. A thrombus or clot formed in the veins can release to the lungs or heart causing life-threatening conditions. Age, weight, immobilization and length of surgery are risk factors for DVT, as well as some types of cancer. DVT risk factors can be assessed by nursing staff through dorsiflexion of the patient's foot, also known as Homan's sign, which reveals calf pain. Record evidence also shows that physical evaluation of the leg can disclose signs of DVT such as edema, temperature and color changes in the affected leg, redness of the calf and cyanosis of the foot. Intermittent or constant pain in the affected leg that develops quickly or worsens upon ambulation is also a sign of DVT. Likewise, tenderness or tight or heavy sensation of the limb or firmness in the affected leg may warn that DVT is present. Prophylactic measures for the prevention of DVT may include anticoagulation drugs, pumping of the foot and compression hose.
Attributing Little's death to the failure of the medical providers to guard against DVT, his widow, Jacqueline Little, and two of his three children from another marriage, Mark Little and Cynthia Little Cameron (hereinafter collectively referred to as "plaintiffs"), filed a claim with the Patient's Compensation Fund in January 2000 against Dr. Pou and Schumpert. Plaintiffs sought a medical review panel determination of whether Dr. Pou and Schumpert's nursing staff fell below the standard of care in failing to identify Little's risk for blood clotting and/or utilize precautions to prevent blood clotting which ultimately led to the emboli. On November 17, 2005, the medical review panel determined that the actions of Dr. Pou did not violate the applicable standard of care. Regarding Schumpert, the panel found a factual dispute as to whether or not Little complained of leg cramps on the evening of January 9, 1999.
In this action following the medical panel review, the children and widow are represented by separate counselthe children, by Anthony Bruscato, and Jacqueline, by Donald Brown. On November 7, 2006, Dr. Pou was dismissed from the suit by summary judgment on the strength of the opinion of the medical review panel. Plaintiffs presented no opposition medical expert because they claimed that Bruscato and Brown received insufficient notice of the hearing date for the motion for summary judgment which had been previously continued. *670 The trial court denied plaintiffs' motion for new trial on the summary judgment at which time the issue of plaintiffs' prior notice was reviewed. A formal judgment dismissing Dr. Pou was signed on March 2, 2007.
A jury trial against Schumpert began on February 12, 2007. The jury ruled in favor of Schumpert, finding that the nursing staff had not breached the applicable standard of care. The final judgment in conformance with the jury verdict was also signed by the court on March 2, 2007.
Appealing both judgments, plaintiffs argue that the trial court erred in failing to grant a new trial on the issue of Dr. Pou's dismissal from the suit by summary judgment and that the jury erred in finding that the nursing staff of Schumpert did not violate the standard of care. In a third argument, Plaintiffs contend that the trial court erred in taxing the expert fees of certain witnesses as costs of the litigation.

Discussion

I.
Regarding the procedural notice for the summary judgment hearing, the record shows that the trial court's first scheduling order fixed the trial date for October 16, 2006. On June 14, 2006, Dr. Pou filed a motion for summary judgment which the trial court set for hearing on August 28, 2006. Attorneys Bruscato and Brown concede that they received adequate notice of the order for this initial setting.
On August 18, 2006, Bruscato sent a letter to the court on behalf of all plaintiffs indicating that all counsel had agreed to an extension of the date for filing plaintiffs' opposition. Subsequently, on August 24, 2006, however, both Bruscato and Brown moved for a continuance of the summary judgment hearing. Attached to the motion was a "Rule to Show Cause" (the "Requested Rule") for a hearing on the requested continuance. This Requested Rule contained service instructions regarding the defendants and included the following in bold print:
Please notify Mr. Anthony Bruscato and Mr. Donald Brown at the address shown under their signatures in plaintiffs' motion.
Instead of a formal hearing on the Requested Rule for continuance, the court conducted a telephone conference on August 25, 2006, to address both the continuance of the summary judgment and the October trial setting. All attorneys participated in the telephone conference except Donald Brown. His client's interest for the joint continuance was to be represented by Bruscato's participation. In the telephone conference, the trial court granted continuances of both the trial and the summary judgment hearing, but the record reflects that the new dates for the proceedings were not fixed.
Nevertheless, the dates were soon fixed when the trial court issued a Memorandum Order later, on August 25, 2006. The Memorandum Order set the hearing on the motion for summary judgment on November 6, 2006 and the new trial date for January 22, 2007. The plaintiffs' Requested Rule for the continuance was also lined-out by the district judge who wrote and initialed the following notation on the Requested Rule:
 See Memo Order
 8/25/06
 CRS
Both Bruscato and Brown conceded that, in accordance with the instruction on the Requested Rule, they received by regular mail a copy of their lined-out Rule with the judge's notation referencing the Memorandum Order. With only this reference in the notation, the Memorandum Order was not included with the Requested Rule. Instead, the trial court faxed a *671 copy of the Memorandum Order to counsel in accordance with the understanding reached in the telephone conference, as follows:

 DISTRIBUTION:
 Original to suit record
 Stamped "Filed" copy via fax to:
 A. Bruscato/D. Brown 318 325-7532
 G. Rountree 226-9200
 M. Goodwin 222-6420

Despite this process for the resetting of the summary judgment hearing, neither Bruscato nor Brown appeared for the November 6, 2006 hearing and no opposition was filed by plaintiffs. The trial judge rendered summary judgment on November 7, 2006, in favor of Dr. Pou "after consideration of the Motion with supporting exhibits and Memorandum, and no Opposition filed by plaintiffs, and plaintiffs having presented no expert witness testimony via affidavit."
On November 15, 2006, all plaintiffs sought a new trial on the summary judgment urging that Dr. Pou was not entitled to summary judgment which was "not secured in accordance with proper procedural laws." At the hearing on the motion for new trial, the court summarized its actions in granting the summary judgment, as follows:
This was a summary judgment that was filed by Dr. Pou represented by Mr. Rountree. We had a telephone conference on this and there were some extensions made and I faxed a memo order. . . . Back in August sometime, and I set the hearing for November 6th. I only faxed the affidavit to Mr. Bruscato. I faxed it to Mr. Rountree and probably to Mr. Goodwin. After that matter came upon November 6th. There had been no opposition filed by that time. . . .
Thereafter, the court heard the arguments of counsel and the testimony of Bruscato regarding the claim of insufficient notice. Bruscato admitted to receipt by regular mail of the lined-out Requested Rule which included the judge's notation. He also testified that he saw the Requested Rule and made a mental note that notice of the hearing date should be coming to his office. Although Bruscato admitted that his office received the faxed copy of the Memorandum Order, he had no recollection of seeing it until he looked in his file the day after the hearing. Bruscato agreed that the trial judge granted his motion for continuance in the phone conference, but did not set the date. He had informed Brown's office that he would attempt to obtain another hearing date, so that Brown did not participate in the phone conference.
On January 29, 2007, the trial judge ruled orally on the motion for new trial during a hearing on three motions in limine. The court made the following ruling in open court:
The motion for new trial will be denied. I am satisfied from reviewing my notes of the proceedings of December 18 and the Court's record, that Mr. Bruscato was participating in a telephone conference that allowed the plaintiffs additional time.
The telephone conference, I am satisfied, did not set the motion for summary judgment date. However, pursuant to the telephone conference, I issued a memorandum order and I faxed that memorandum order to Mr. Bruscato and to Mr. Brown, basically at Mr. Bruscato's fax number. I did not send it to a separate fax number for Mr. Brown. I also faxed it to Mr. Goodwin and Mr. Rountree.
Thereafter the Clerk mailed notices referring to my note on pleadings, please see, or words to that affect (sic), please see the memo dated August 25, 2006. That memo order did set a summary *672 judgment date. On the date for summary judgment, which was to be submitted on briefs without oral argument, the plaintiffs at that time had not submitted any proof pursuant to Articles 966 and 967 of the Louisiana Code of Civil Procedure that would show that they could prove that Dr. Pou failed to meet the standard of care. Accordingly, I granted the motion for summary judgment.
I'm satisfied that Mr. Bruscato had actual notice of the hearing for summary judgment, and that the plaintiffs had acquiesced in Mr. Bruscato speaking on behalf of all the plaintiffs. For those reasons the motion for new trial is denied.
The trial court signed a written final judgment denying the new trial on March 2, 2007.
Trial courts are vested with authority to grant new trials under La. C.C.P. art.1972 on peremptory grounds which appear to have no application in this instance. Under La. C.C.P. art.1973, a new trial may be granted in any case if there is good ground therefor. The standard of review of a denial of a motion for new trial on discretionary grounds is that of abuse of discretion. Drapcho v. Drapcho, 05-0003 (La.App. 1st Cir.2/10/06), 928 So.2d 559, writ denied, 06-0580 (La.5/5/06), 927 So.2d 324; Smith v. Alliance Compressors, 05-855 (La.App. 3d Cir.2/1/06), 922 So.2d 674.
Due process at a minimum requires deprivation of life, liberty or property be preceded by notice and an opportunity to be heard at a meaningful time. Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Patrick v. Patrick, 227 So.2d 162 (La.App. 2d Cir. 1969), writ refused, 255 La. 238, 230 So.2d 91 (1970); Zachary Taylor Post No. 3784 v. Riley, 481 So.2d 699 (La.App. 1st Cir. 1985). The notice given must be reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection. Armstrong, supra.
La. C.C.P. art. 1571 requires district courts to prescribe the procedure for assigning cases such that all parties receive adequate notice of trial. La. C.C.P. art. 1572 provides for written request of notice of trial as follows:
The clerk shall give written notice of the date of the trial whenever a written request therefor is filed in the record or is made by registered mail by a party or counsel of record. This notice shall be mailed by the clerk, by certified mail, properly stamped and addressed, at least ten days before the date fixed for the trial. The provisions of this article may be waived by all counsel of record at a pre-trial conference.
A judgment that does not determine the merits but only preliminary matters in the course of the action is an interlocutory judgment. La. C.C.P. art. 1841. La. C.C.P. art. 1914 provides for notice of interlocutory judgments in pertinent part, as follows:
A. Except as provided in Paragraphs B and C of this Article, the rendition of an interlocutory judgment in open court constitutes notice to all parties.
B. The interlocutory judgment shall be reduced to writing if the court so orders, if a party requests within ten days of rendition in open court that it be reduced to writing, or if the court takes the interlocutory matter under advisement. The clerk shall mail notice of the subsequent judgment to each party.
* * * * *
D. Except as provided in Paragraph C of this Article, each party shall have ten *673 days either from notice of the interlocutory judgment, or from the mailing of notice when required to take any action or file any pleadings in the trial court; however, this provision does not suspend or otherwise affect the time for applying for supervisory writs, nor does it affect the time for appealing an interlocutory judgment under Article 2083.
* * * * *
Plaintiffs argue that the provisions of La. C.C.P. arts. 1313 and 1314[1] apply to the resetting of the hearing for summary judgment. Pursuant to these provisions, plaintiffs argue that they were entitled to receive notice by certified or registered mail or sheriff's service. Plaintiffs also argue that they were entitled to receive the lined-out Requested Rule by certified mail pursuant to La. C.C.P. art. 1572 because they included the written request quoted above for notice of the hearing date on the order. Thus, according to plaintiffs, the mailing of the lined-out Requested Rule by the clerk of court provided insufficient notice. Finally, Donald Brown argues that the fax to Bruscato of the Memorandum Order was insufficient notice to him.
Articles 1313 and 1314 pertain to service of pleadings from the moving party to adverse parties. Also, service of incidental orders setting a hearing date obtained by the moving party are addressed in those provisions. Initially, Article 1314 would have applied to Dr. Pou for the first setting of the August 28, 2007 hearing on his motion for summary judgment. However, plaintiffs admittedly received notice of Dr. Pou's pleading and notice of that initial hearing date. The second setting occurred as the result of the plaintiffs' own pleading for a continuance. Accordingly, we find that Articles 1313 and 1314 do not govern the issue of notice to the plaintiffs.
The relief which the plaintiffs requested was granted in the written Memorandum Order which reflected the pre-trial phone conference grant of their motion for continuance. It simply reads: "The motion to continue the summary judgment is granted and the summary judgment is fixed for the 6th day of November, 2006. . . ." We view this as an interlocutory judgment, granting the continuance and rescheduling a hearing date as "preliminary matters in the course of the action." La. C.C.P. art. 1841. Accordingly, notice of the interlocutory judgment was required under Code of Civil Procedure Article 1914.
Subpart A of Article 1914 recognizes the notice received by the party in open court when the trial court renders an order. Subpart B requires notice by mail from the clerk of court when the trial court takes the interlocutory matter under advisement and renders a written order or judgment. The notices of the trial court's action received by Bruscato and Brown in this instance were provided within the context of both of these provisions. First, although not in open court, the district judge granted the continuance for the hearing on the motion for summary judgment in the phone conference. This oral ruling was received by Bruscato on behalf of all plaintiffs by his participation in the conference. The actual dates for resetting the motion and the jury trial were identified later on the day of the conference by the written Memorandum Order of the trial court. Therefore, a second notice pertaining to the Memorandum Order was given in keeping with Article 1914(B) when the clerk mailed to both attorneys their lined-out Requested Rule with the trial *674 judge's written notation to "see memo order." As the moving parties, they received written notice of a resetting which they had requested. Moreover, in the telephone conference, the district judge received Bruscato's fax number and a file stamped copy of the Memorandum Order was faxed to Bruscato, who was acting on behalf of all plaintiffs at the conference. Although the November 6 date of the resetting was not mailed to Brown, his receipt of the trial court's notation to see the Memorandum Order and the faxed notice of the resetting date to Bruscato satisfy the notice requirements of due process to Brown's client under these facts.
Finally, since we find Article 1914 controlling, and in view of the pre-trial conference and the agreed upon process for faxing the notice of the setting, we do not find the formal procedure for notice of trial under Article 1572 applicable. In any event, the written request for notice of the trial date envisioned in that provision was not made by plaintiffs.
As the moving parties who received clear notice that the trial court had granted them a continuance, the determination of a new date for the matter was not something the plaintiffs could simply assume might never occur. Yet, plaintiffs waited 73 days, attempting no review of the matter, with the original October setting for jury trial of the entire case having come and gone. The trial court's reflections on the process indicate that the determination of the date for the resetting was clearly understood as imminent at the close of the phone conference. The date was selected that very day, and its identification in the Memorandum Order was transmitted adequately to the attorneys for the moving parties. The trial court's ruling not to reopen the matter after this procedural default was not an abuse of discretion. The assignment of error regarding the summary judgment dismissal of Dr. Pou is without merit.

II.
Plaintiffs next contend that the jury verdict was in error in finding that the nursing staff of Schumpert did not breach the standard of care regarding Little's DVT development potential. At trial, the parties presented the testimony of fact and expert witnesses in support of their positions.
It is well settled that a hospital is liable for its employee's negligence, including its doctors and nurses, under the respondeat superior doctrine. Wright v. HCA Health Services of Louisiana, 38,427 (La.App.2d Cir.6/23/04), 877 So.2d 211; Williams v. Memorial Medical Center, 03-1806 (La.App. 4th Cir.3/17/04), 870 So.2d 1044, writ denied, 04-0963 (La.6/4/04), 876 So.2d 93.
In a malpractice claim against a hospital, the plaintiff is required to prove by a preponderance of the evidence, as in any negligence action, that defendant owed plaintiff a duty to protect against the risk involved (or the applicable standard of care), defendant breached its duty (or the applicable standard of care), and the injury was caused by the breach. La. R.S. 9:2794 A; Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La. 10/17/94), 643 So.2d 1228; Ball v. Charter Forest Behavioral Health System, Inc., 41,329 (La.App.2d Cir.8/23/06), 938 So.2d 1092; Hinson v. The Glen Oak Retirement System, 37,550 (La.App.2d Cir.8/20/03), 853 So.2d 726, writ denied, 03-2835 (La.12/19/03), 861 So.2d 572.
Nurses who perform medical services are subject to the same standards of care and liability as are physicians. Cangelosi v. Our Lady of the Lake Medical Center, 564 So.2d 654 (La.1989); Hinson v. *675 The Glen Oak, supra; Ewing v. Aubert, 532 So.2d 876 (La.App. 1st Cir.1988), writ denied, 551 So.2d 1333 (La.1989); Gibson v. Bossier City General Hosp., 594 So.2d 1332 (La.App. 2d Cir.1991). The nurse's duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Ball v. Charter Forest Behavioral Health System, supra; Hinson v. The Glen Oak, supra, and citations therein.
Injury alone does not raise a presumption of negligence. La. R.S. 9:2794 C; Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502; Fluck v. Coffman, 37,739 (La.App.2d Cir.12/12/03), 862 So.2d 1105. Hindsight or subsequent events cannot be considered when determining whether the actions of the nursing staff were reasonable and met the standard of care. Instead, the professional judgment and conduct of the nurses is evaluated under the then existing circumstances, not in terms of result or in light of subsequent events. Ball v. Charter Forest Behavioral Health System, supra; Hinson v. The Glen Oak, supra, and citations therein.
The jury's finding in a medical malpractice case is subject to manifest error review: it cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646; Jackson v. State, 39,759 (La. App.2d Cir.6/29/05), 907 So.2d 250, writ denied, 05-2021 (La.9/29/06), 937 So.2d 850. In order to reverse the jury's finding of fact, the appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Salvant v. State, supra. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270. Where there are two permissible views of the evidence, the jury's choice between them cannot be manifestly erroneous or plainly wrong. Id.
Dr. Pou was tendered as an expert in the field of otolaryngology ("ENT"). He testified that he saw Little for chronic sinus problems and eventually recommended sinus surgery. Little reported no blood clotting problems and provided no history of leg or muscle cramps, although he had high blood pressure and diabetes. Blood work showed that Little's platelet count was normal.
Dr. Pou testified that Little's surgery on Friday, December 8, lasted a little less than two and one-half hours. The complication did not lengthen the surgery for more than three or four minutes, although it required Little's hospitalization for an estimated forty-eight hours. Pou admitted Little for observation for fever and infection, the administration of antibiotics and bed rest.
Dr. Pou stated that because sinus surgery patients experience head pain, he ordered Little's head elevated to lower his cerebral spinal pressure to prevent leakage. He also ordered strict bed rest although Little was permitted to move his legs in bed. Dr. Pou testified that during his entire hospital stay, Little never complained of leg pain and was able to move his legs in bed. Dr. Pou never examined Little's legs, checked his Homan's sign or ordered the nurses to exercise Little's legs. Dr. Pou did not prescribe compression *676 hose, sequential compression devices or anti-coagulants. Dr. Pou released Little on Monday, January 11, after Little's nose was irrigated in the emergency room. During the twenty minute procedure, Little did not complain of leg pain. He put weight on and moved his legs.
Dr. Pou testified that in his opinion, Little was not at high risk for DVT. Dr. Pou stated that DVT and pulmonary embolism following sinus surgery is exceedingly rare and that he had never seen these conditions develop in a sinus patient during his twenty-two years of practice.
Jacqueline Little testified concerning her husband's complications after surgery. She recalled that Little's head was elevated and his feet were flat. They were instructed he was not to move from that position. She stayed with him on Friday night and he complained of head pain. The following day, she traveled back to West Monroe, leaving the hospital in the morning and returning around 3:00 or 4:00 in the afternoon.
Jacqueline recalled that about 7:30-8:00 p.m. on Saturday evening, Little began to complain of leg cramps but he refused to summon a nurse. Jacqueline remembered the pain occurred for about 30 minutes and worsened. The couple opted for putting hot towels on his legs before calling a nurse for pain medicine. Jacqueline claimed that she called a nurse about 8:30 p.m. and informed her that Little was having leg pain. The nurse suggested Tylenol # 3. Jacqueline continued to administer hot towels on Little's legs. Jacqueline testified that at some point when she was in the bathroom, a nurse came into the room with medicine. She testified that Little informed the nurse that his legs were cramping and she did not examine his legs. Jacqueline could not recall that any nurse examined Little's legs during the entire time she was with him at Schumpert. According to Jacqueline, the incident on Saturday evening ended upon Little's falling asleep.
On Sunday morning, Jacqueline testified that Little was doing better. Dr. Pou gave Little bathroom privileges. Nothing was said to Dr. Pou about Little's leg cramps. Little's son came to visit and assisted him to the bathroom although Little did not ambulate otherwise during the day. At approximately 7:30-8:00 p.m., Little again began to complain of leg cramps. Admittedly, however, the Littles did not report the cramps to the nurses.
On Monday morning, Jacqueline testified that Little suffered from a headache and was apprehensive about a procedure he was to undergo before discharge. She called the nurses' station and Little was administered pain medication. Earlier that morning, Little went to the bathroom; he had no problem walking to and from the bathroom with Jacqueline's assistance and made no complaints of leg pain. Little was transported downstairs for the nose washing procedure and afterwards, he came back to the room. At approximately 9:00 a.m., she assisted Little in getting dressed, and they left the hospital with instructions to keep his head above his waist. Jacqueline recalled that Little complained of a headache.
After the Littles arrived in West Monroe, Jacqueline assisted him out of the car. Little complained of leg cramping at that time but he refused her request to call the doctor. Little sat down in his recliner. After Jacqueline finished unloading the car, she checked on Little. He complained of leg cramps and wanted to take a hot bath. As she helped him out of the tub, he collapsed. She dialed 911 and Little was transported to a Monroe hospital where he died.
*677 On cross-examination, Jacqueline testified that Little was approximately six feet tall and weighed about 230-240 pounds. He was a diabetic since 1996 and had high blood pressure. To her knowledge, he did not have cancer and had no history of blood disorders. She was not aware of the fact that Little had taken quinine in the past for leg cramps until she saw his medical records. She did not know he saw his primary care physician for leg cramps in December of 1997 and September of 1998. She admitted that Little sometimes complained of pain in his legs after doing yard work and that leg cramps were not unusual for him. She stated that the cramps he had in the hospital were like those he experienced at home.
Nurse Lanelle Boyet testified that she was a registered nurse who worked for Schumpert from 1991 to the present. Boyet took care of Little on the Saturday 3-11 shift. Boyet testified that she did an opening narrative entry in Little's chart at 4:00 p.m. She also filled out his Patient Assessment Form which was part of the nurse's notes and contained the results of physical assessments by the nurse of the patient's skin, neurological, musculoskeletal, gastrointestinal, respiratory, cardiovascular and genitourinary systems and the patient's psychosocial condition. The cardiovascular assessment portion of the form contained the following language:
ASSESSMENT NORM:
Regular apical pulses. S1 and S2 normal in all valve areas. Neck veins flat at 48°. Peripheral pulses palpable. No edema. No calf tenderness.
For normal results, the nurse placed a check mark in the box which corresponded with the shift in which the assessment was done. Boyet also placed her initials in the box. For an abnormal assessment, an asterisk was placed in the box with a note explaining the abnormality. The assessment form from the Saturday 3-11 shift documents that Boyet performed every relevant assessment of Little including cardiovascular. Boyet testified that she generally asked the patient relevant questions. She acknowledged that the cardiovascular assessment included a determination of whether a patient had calf tenderness. She did not as a matter or practice touch the calves of the patient. Regarding her assessment of Little, Boyet testified that she found no abnormal findings, including her evaluation of his lower extremities. Specifically, she found no swelling or calf tenderness in his legs.
Boyet reported that Little complained of a slight headache at 8:00 p.m. and she gave him Lortab. She returned to see him at 9:15 p.m. and the pain was undiminished. She called Dr. Greer and he ordered Demerol and Phernergan. Boyet was concerned about the head pain because of the surgery complication. She revisited Little at 10:30 p.m. and observed he was sleeping and his pain appeared to be gone. She did not recall Little complaining of any leg pain during her shift. Boyet did not recall Jacqueline administering warm towels to his legs. If she had seen this, she would have informed the Littles not to administer the hot towels unless the doctor ordered them. If she knew he was having leg cramps, she would have asked about any history of cramps. Boyet testified that she probably would not have called a physician for a one-time complaint of leg pain but she would have examined his legs to see if anything was wrong.
Nurse Boyet reviewed in her testimony her knowledge of the medical symptoms and treatment of DVT. Boyet testified that she would not generally do leg exercises with a patient who is capable of moving his legs. She routinely asked every patient to dorsiflex his or her foot, but she did not remember if she asked Little to do so. *678 Boyet testified that a nurse can instruct a patient to pedal with his feet without a doctor's order.
Nurse Nathan Owers attended Little on the Sunday 3-11 shift when the patient had been given bathroom privileges. Owers agreed that age and immobility are risks associated with DVT. Owers testified that he did a full assessment of Little and that his calf assessment would have involved touching Little's calf. Owers' assessment record showed that Little had no swelling or calf tenderness.
Nurse Kim Eustis cared for Little on the morning of his release, Monday, January 11, 1999, and handled his discharge. Eustis's assessment form contained no mark for the cardiovascular evaluation. Nurse Eustis explained that she erred in failing to mark the box, although she believed she assessed Little in that regard. She testified that it was her routine to ask the patient to press his foot onto her hand to determine calf tenderness, but that it was not her practice to feel the patient's calf. Nurse Eustis had no independent recollection of Little and she admitted that it was possible that she was interrupted during Little's assessment and neglected to do the cardiovascular assessment. She admitted that positive calf tenderness indicated the possibility of DVT.
Nurse Nancy Darland, who taught nursing for over twenty years, testified as the plaintiffs' expert in the field of nursing. In her opinion, the Schumpert nursing staff did not properly assess Little for certain risk factors, did not perform a formal nursing assessment and did not institute appropriate measures to aid in the prevention of DVT. Darland further explained that age, weight, immobilization and length of surgery are risk factors for DVT. She opined that in Little's case, all of these factors were present and should have alerted the nurses to make a DVT assessment and intervene to reduce those risks. Darland testified that the nursing staff should have conducted the Homan's sign test and that any failure to touch the patient's calf while asking the patient to flex the foot fell below the standard of care. Also, merely touching the calf without conducting the Homan's sign maneuver was insufficient.
Darland reviewed Nurse Eustis's assessment form from December 11. She noted Eustis's omission in reporting a cardiovascular assessment and testified that the issue of calf tenderness and edema would have been relevant for Little. Because Little was being discharged, a more stringent assessment was called for. Darland also testified that in her opinion, the nursing staff should have instructed Little to do calf pumping exercises due to his immobility. Darland concluded that the nurses' failure to conduct the Homan's sign and to do the cardiovascular assessment before Little's discharge fell below the standard of care and related to his death.
In her testimony, Darland reviewed a 1994 nursing magazine article concerning DVT assessment (hereinafter the "Hickey Article"). Darland testified that it was part of basic nursing care to require calf pumping exercises be done on a patient like Little who exhibited increased risk factors for DVT. The Hickey Article gave nurses a guide for reviewing a patient's individual risk factors. Darland concluded that the Hickey Article was authoritative in its conclusion that nearly all patients are at some risk for DVT. Through the checklist, the nurse would be able to rate the patient's risk by examining certain factors. Nevertheless, she admitted that the Hickey Article indicated that the Homan's sign would be positive in only ten to twenty percent of DVT cases, and that nothing in Little's chart indicated a positive Homan's *679 sign. Nurse Darland testified that nurses chart by exception, meaning that only abnormal findings are reported. She agreed that Little's chart showed no evidence of leg cramping and that Little was capable of moving his legs and dorsiflexing his feet. She found no charting errors regarding Little's activity levels.
On cross-examination, Darland testified that in her opinion, in 1999 nurses should have assessed the risks of all patients who were hospitalized for two to three days. She agreed that if a nurse determined that a patient did not have risk factors, the Homan's sign procedure would not be required under the standard of care. Darland testified that if a patient does not complain of pain on dorsiflexion of the foot, then the Homan's sign is negative. Nurse Darland did not label Little as obese; she listed obesity as a factor in his case because his chart characterized him as such. However, she felt that his age and immobility were risk factors. She did not believe that Dr. Pou's repair of the leak greatly extended the time of the surgery. She did not know of any literature listing ENT surgery as a DVT risk factor. She also agreed that Little might have developed blood clots even if the nurses had assessed Homan's sign and instructed him to perform calf pumping exercises. She was aware of no patients who had undergone sinus surgery who had experienced pulmonary embolism.
Elizabeth Neidlinger, Schumpert's expert witness in the field of nursing, is the director of progressive care and progressive care in central telemetry at Schumpert. She serves as co-chairman of the DVT Task Force. Nurse Neidlinger testified that she has treated patients with CSF leaks after sinus surgery and was familiar with the standard of care applicable to nurses providing post-operative treatment to patients after ENT surgery in 1999.
Nurse Neidlinger testified that in her opinion, the Schumpert nursing staff met the standard of care applicable to nurses in 1999 in treating Little. She explained that in 1999 there was no protocol for assessing the risk of DVT. She also testified that in January of 1999, Schumpert had no written policy relating to the care of post-operative patients who may have been placed on strict bed rest.
Neidlinger testified that nurses physically re-assessed a patient on every shift. She testified that while it was a nurse's duty to physically assess the patient, the assessment of risk is primarily a physician's duty. This was true of assessing the risk of DVT in 1999. She testified that the chart demonstrated that the nursing staff did the physical assessments in accordance with the standard of care.
Although Neidlinger admitted that the Hickey Article discussed the assessment of risks for DVT and suggested a strategy for assessing patients, it established no standard of care for 1999 because one article alone does not create a standard of care. Neidlinger agreed with the article which stated that day surgery and immobility are risks for the development of DVT. She testified that even at the time of her trial testimony, there was no national standard for the treatment or prevention of DVT. She again pointed out that the Hickey Article considered a 72-hour length of stay a risk factor. Here, it was anticipated that Little would require only a 48-hour hospital stay, and he was able to get out of bed during that time.
Further, Nurse Neidlinger testified that in 1999, checking the Homan's sign was not part of the routine nurse's assessment of medical/ surgical patients such as Little unless the patients presented with symptoms. It was the standard of care in 1999 *680 for nurses to notify the physician only if a patient exhibited symptoms of DVT. Likewise in 1999, it was not the standard of care for nurses to instruct a patient, like Little, who had undergone ENT surgery to exercise or move his legs or engage in calf pumping exercises.
Regarding Jacqueline's claim that Little complained of leg pain on Saturday night, Nurse Neidlinger testified that DVT is generally exhibited in only one extremity. Here, because Jacqueline reported leg cramps in both legs, DVT would not have been her first consideration. The lack of nurses' notes documenting the leg cramps led Neidlinger to believe that they were not reported to the nurses.
The defense also called Todd Little ("Todd") to testify on cross-examination. Todd was the sole heir who did not join in the suit. Todd visited with his father on Sunday. He arrived with his wife and children at approximately 11:30 a.m. and stayed about an hour. His stepmother, Jacqueline, was present during the visit. Todd testified that his father had complaints relating to the sinus surgery but not to his legs and he was able to get out of bed. Todd assisted him to the bathroom. His father was able to bear weight on both legs and had no problems walking to the bathroom. His father returned to bed by himself.
Todd testified that he spoke with Jacqueline about his father's leg cramps after his father's death. Todd recalled that Jacqueline told him that his father had leg cramps on the day that he died, and also before his admission to Schumpert on January 8. Todd testified that Jacqueline never told him about his father having leg cramps during his hospital stay.
Dr. Keith Christy, a member of the medical review panel that evaluated Little's case, testified as an expert ENT and an expert in the standard of care applicable to post-operative ENT surgery nursing care. Dr. Christy explained that the medical review panel found no recommendation, rule or guideline which would have required Schumpert to have in place a policy for prophylactic treatment against DVT. Thus, the panel found no merit to plaintiffs' claim against the hospital regarding a requirement that the hospital have such a policy on this issue.
Dr. Christy explained that deep vein clots develop in the legs, arms and pelvis as well as the abdominal area. In Little's case, there was no way of knowing where the clots originated. Dr. Christy testified that Little's autopsy showed evidence of pancreatic and prostate cancer and he noted that, in particular, pancreatic cancer patients are likely to develop blood clots.
Dr. Christy testified that in January of 1999, it was not his practice to order hose or compression devices for ENT surgery patients, except those with cancer. Nor was it his practice to check the legs of his post-operative ENT patients. He testified that pulmonary emboli following sinus surgery is extremely rare. Dr. Christy testified that in this specific case, Little was not at high risk for DVT. In Dr. Christy's opinion, it was not the standard of care for nurses caring for a post-operative ENT patient to check the legs of such patients absent a complaint or sign or symptom of clotting.
From this evidence, we find that the jury could reasonably conclude that both the standard of care and the facts observed by the nurses or reported to them did not reveal malpractice on the part of Schumpert's nursing staff. The standard of care was not so clearly defined by medical authority to require the more extensive DVT assessment defined by Nurse Darland. The defense expert testimony was that the assessments given to Little by the *681 various nurses who attended him were sufficient to alert the staff to the possibility of DVT, such that an appropriate standard of care was met under the circumstances of his hospitalization. The key to the nursing staff's observations of their patient was the lack of any reports of leg pain. The jury could conclude that the Saturday night incident described by Jacqueline was never reported to Nurse Boyet. It is reasonable to conclude that had the incident been reported, the cardiovascular assessment checklist would not have reported "no calf tenderness" and the reason for the required pain medications given that evening would have been related to leg pain. The testimonies of Jacqueline and Nurse Boyet were at odds, and the jury could choose Nurse Boyet's testimony which finds corroboration in the contemporaneous medical records. While there was one charting omission on Monday morning as Little prepared to leave the hospital, there was no report by Jacqueline indicating Little's leg pain on that morning prior to his leaving the hospital.
Finding no manifest error in the jury's verdict, the plaintiffs' assignment of error is without merit.

III.
Regarding the disputed expert witness fees assessed to plaintiffs, the record shows that the trial court rendered final judgments on the merits and plaintiffs' motion for new trial on March 2, 2007. The judgment on the merits generally assessed all court costs against plaintiffs, but did not specifically fix any expert witness fees. Thereafter, plaintiffs were granted a devolutive appeal of the judgments on March 22, 2007.
On May 14, 2007, Schumpert filed a Motion to Tax Costs requesting the court to assess certain expert witness fees and trial expenses as costs against plaintiffs. The trial court rendered judgment in favor of Schumpert on June 11, 2007, setting three expert witness fees as costs. Plaintiffs never appealed that judgment.
The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to set and tax costs and expert witness fees. La. C.C.P. art.2088. A judgment for costs rendered after the final judgment on the merits is a separate and appealable judgment. In re Succession of Pitman, 42,654 (La.App.2d Cir.10/24/07), 968 So.2d 871; Hoyt v. State Farm Mutual Automobile Insurance Co., 623 So.2d 651 (La.App. 1st Cir.1993), writ denied, 629 So.2d 1179 (La.1993).
According to this jurisprudence and the clear implication of Article 2088, an assessment of costs which proceeds separately from the prior appeal of the judgment on the merits requires a separate appeal. Because plaintiffs failed to appeal the judgment which assessed the expert witness fees as costs against plaintiffs, the judgment became final, and plaintiffs are precluded from raising any error in the judgment on appeal.

Conclusion
For the foregoing reasons, the summary judgment, jury verdict judgment and judgment on motion to tax costs are affirmed. Costs of this appeal are assessed against plaintiffs.
AFFIRMED.
BROWN, Chief Judge, concurs with written reasons.
*682 BROWN, Chief Judge, Concurring.
I disagree with this court's refusal to address the disputed expert witness fees. The final judgment on the merits assessed all court costs to plaintiffs. This judgment was appealed by plaintiffs. Thereafter, a motion was filed in the trial court to determine the dollar amount of the expert witness fees. Plaintiffs objected to the inclusion of two of the expert witness fees as court costs. Requiring a second appeal to proceed on a separate track would be awkward and, of course, impose an additional expense. The majority cites only two cases to support its position. In Re Succession of Pitman involved a case in which only the allocation of court costs was appealed. The other case, Hoyt v. State Farm, is not convincing.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] La. C.C.P. arts. 1313 and 1314 provide for the service of pleadings subsequent to the original petition by mail or other delivery methods or by the sheriff.