CARAWAY, J.
Lin this medical malpractice action filed against an emergency room physician and hospital, a jury found that the medical negligence of both defendants caused the death of the plaintiffs’ wife and mother and awarded damages. The trial court denied the defendants’ judgment notwithstanding the verdict and they appealed. For the reasons that follow, we affirm.

Facts

At approximately 8:40 p.m. on April 9, 2009, 39-year-old Jody Bolton presented to the Willis-Knighton Pierremont emergency room with complaints of head and neck pain, body aches, nausea, vomiting, chills and a rapid heart rate. The Bolton family, including Tommy, Jody and their two minor children, Luke and Erica, had left Monroe, Louisiana, after work to begin a family vacation. Tommy’s parents traveled with the family. The group ate before they left Monroe to travel to Dallas. About 30 minutes after eating, Jody began to feel nauseated. Approximately 30 minutes after that, Jody was increasingly nauseated and had begun to experience chills. Believing she had fever, Jody took Tylenol. Still her condition deteriorated. Upon their arrival in Shreveport, the couple obtained directions to the Willis-Knighton Pierremont emergency room.
While Tommy filled out paperwork, at approximately 8:47 p.m., Jody was called back to triage, the initial nurse patient evaluation. The triage nurse described Jody’s acuity as 3-Urgent. Her patient history, taken by the triage nurse and documented in the hospital computer charting system, included thyroid and Hodgkin’s disease and migraine headaches. The nurse 12also noted Jody’s surgical history which included an appendectomy, lumpectomy and exploratory spleen removal.[1]
At 8:50 p.m., Jody’s vital signs included blood pressure of 111/68, heart rate of 163, temperature of 102 and pain of 9/10. Jody informed the nursing staff that her heart rate normally ran high when she was sick. Triage was completed at 8:55 p.m.
Nurse Paul Vercher, II, was assigned as Jody’s primary nurse at 9:00 p.m. when Jody was transferred from triage to the emergency room. At 9:01 p.m., Dr. Ed *80 ward Paul began attending Jody.[2] He ordered routine lab work including blood and urine samples, blood cultures, a chest X-ray and an EKG. The blood work returned negative for bacteria. Jody’s white blood count was 14,000 with left shift.
Jody was given Ibuprofen at 9:05 and 11:18 p.m., which helped to decrease her temperature. She was also given 1000 ml, IV fluids at 10:05 p.m. She was administered two doses of Zofran for nausea. Jody also received both Demerol and Ati-van for pain at 12:11 a.m.
Because of his concern that Jody might have meningitis, Dr. Paul conducted a lumbar puncture at 12:30 a.m. on April 10. Because the spinal fluid was clear, Dr. Paul was able to rule out bacterial meningitis.[3]
At 1:31 a.m., Dr. Paul issued a “[d]iffer-ential diagnosis” for Jody which included viral infection, bacterial infection, URI, UTI, and ^meningitis.[4] At 1:38 a.m., Dr. Paul ordered Jody’s discharge. It was not until 2:16 a.m. that her paperwork was finalized. Jody remained at the hospital until 3:03 a.m. because she waited for Tommy to retrieve medications at a local pharmacy.
By 2:15 a.m., the Zofran had eased Jody’s nausea. However, at approximately 2:17 a.m., Jody’s heart rate elevated to 155; her blood pressure was 115/75. Upon Tommy’s return to the hospital, Nurse Vercher informed him that Jody’s heart rate was high. The nurse did not document these concerns. At 2:25 a.m., on Dr. Paul’s order, Jody was given Lopressor to lower her heart rate. At 2:31 a.m., Jody received 500 ml, IV fluid. When Jody left the hospital, her heart rate and blood pressure had dropped to 133 and 87/52 respectively. She was instructed to return to the hospital if “symptoms worsen[ed] or persist[ed].” Jody was “sound asleep.” Tommy took Jody to a nearby hotel where his mother and father were waiting. Jody was “groggy” from the medication and could hardly walk. Tommy put her to bed, noting that she was “sound asleep.” He watched her as long as he could before he fell asleep. He woke up to find Jody in the bathroom with diarrhea. She refused to go back to the hospital and instead got back into bed and went to sleep. Tommy once again fell asleep and awoke to find Jody in the bathroom again, running a tub of hot water. Jody indicated that she did not feel well and wanted a bath. Tommy noted that her head was warm and he gave her Advil which had previously reduced her fever. Tommy fell asleep again and woke up to Jody’s moaning. When he |4observed that her bottom lip was discolored, Tommy called his mother. As the two attempted to dress Jody, she yelled that her back was hurting. The two then called 911.
Jody arrived at Willis-Knighton Pierre-mont at approximately 9:14 a.m. At 9:20 a.m., Dr. Eustace Edwards recognized Jody’s distress and intubated her. Within three minutes, however, Jody coded. Numerous resuscitation efforts were ultimately unsuccessful and Jody expired at 10:51 a.m. on April 10, 2009.
*81 An autopsy indicated the primary cause of death to be acute bilateral adrenal hemorrhage. Other autopsy findings included “septic shock, clinical,” and “tonsillitis.” The autopsy report noted the tonsils were “enlarged and diffusely hyperemic.” The brain showed “no evidence of infection,” and microscopic examination “showed no evidence of infection or disease.” No evidence of “meninges” relating to meningitis was noted and “examination and cultures of the CSF and blood were negative for infectious organisms.” Ultimately the report indicated that the “cause of adrenal hemorrhage” was “uncertain as no other significant pathologic abnormalities were indicated on review of the tissue or indicated by the medical records.” The death certificate listed the immediate cause of death as septic shock due to acute bilateral adrenal hemorrhage.
Tommy submitted a complaint against Dr. Paul and the Willis-Knighton Health System to a medical review panel alleging failures to enforce rules, policies and/or standards regarding the admission of patients and the release and discharge of a medically unstable patient. Further | .^allegations of negligent care and treatment and the release of a high risk (sepsis) patient without a proper consult were made to the panel. The panel issued an opinion in August of 2010.
By 3-0 vote, the panel members concluded that Dr. Paul failed to meet the standard of care which “was a contributing factor in the resultant damages.” However, one of the physicians was “uncertain” if the deviation would have “changed the outcome for the patient,” while noting that if Jody had been admitted “she may have had a better opportunity at survival.” Specifically regarding Dr. Paul, the panel concluded:
The panel finds the records support that the patient was unstable at discharge and had not responded to intervention during the emergency stay. At 0217 (after the spinal and negative results reported), the patient’s heartbeat was 155. Dr. Paul ordered Lopressor to lower heart rate, but this did not address the cause of the problem. At 0302 the patient was hypotensive and tachy-cardic, indicative of sepsis. The cultures returned normal, but the vitals were abnormal at discharge. The panel would not have administered Lopressor. The physician failed to find the cause of the problems. Admission to the hospital and/or ICU was indicated. The lack of antibiotics was also a concern. Even if the patient had not been asplenic, the patient’s vitals were unstable and necessitated admission.
Relating to Willis Knighton, Health System, by a vote of 2-1, the panel found that the evidence supported the conclusion that the hospital personnel failed to meet the applicable standard of care, but was unable to determine if the conduct was a contributing factor to the “resultant damages” as follows:
[T]he Willis Knighton Pierremont hospital nursing staff failed to comply with acceptable care of Ms. Bolton during her first stay in the Emergency Room. The nurses failed to document the patient’s condition at discharge. The staff failed to advocate for the patient in this instance. The staff failed to document voiced concerns made to family regarding the patient’s condition at discharge. It was evident lfifrom the records the nursing staff did notify the physician of the patient’s tachycardia and subsequently followed physician orders administering the bolus and Lopressor. The staff failed to perform adequate discharge reassessment and failed to document the discharge assessment ... The two panel members who found a breach *82 were unable to determine if this breach was a factor in the injuries to Ms. Bolton.[5]
On August 27, 2010, Tommy, individually, and on behalf of his two minor children (“Plaintiffs”), filed suit against the Willis-Knighton Medical Center (“WK”) and Dr. Paul alleging claims of medical malpractice and tortious violations of state and federal “anti-dumping” laws, including the Emergency Medical Treatment and Active Labor Act (“EMTALA”). Plaintiffs asserted the joint and several liability of WK and Dr. Paul based upon the same claims raised before the medical review panel. It was alleged that Dr. Paul was WK’s independent contractor.
After hearing the testimony and considering the evidence before it, a jury returned a verdict on December 7, 2011. The jury found no liability for EMTALA violations. On the malpractice claims, however, the jury found malpractice liability and assessed WK with 40% fault and Dr. Paul with 60% fault. The jury determined that Dr. Paul was an independent contractor and awarded Tommy and his two children $50,000 each in damages, $15,000 funeral expenses and $1,071,541 for past and future lost income.
On April 19, 2012, Dr. Paul and WK sought a Judgment Notwithstanding the Verdict (JNOV) on the grounds that the Plaintiffs failed to establish by expert testimony that Jody had a greater than 50% chance of survival and that expert testimony failed to establish the standard 17of care as to WK. At a hearing on the motion held on June 13, 2012, the trial court orally denied the JNOV. A signed judgment followed on July 5, 2012. This appeal by WK and Dr. Paul (“Defendants” and/or “Appellants”) ensued.[6]

Discussion

In their assignments of error, Appellants’ primary challenge to the jury’s verdict concerns the issue of causation and the link between any breach of their standards of care and Jody’s death. Appellants assert that Jody had a less-than-even chance of survival at best and therefore the jury erred in its finding that Appellants’ conduct combined to cause Jody’s death. Citing Smith v. State, Dept. of Health & Hosp., 95-0038 (La.6/25/96), 676 So.2d 543, they argued that the wrongful death verdict required proof that Jody had a greater than 50% chance of survival. Since the jury was not instructed regarding the so-called last chance of survival claim as defined by Smith, appellants seek a complete reversal of the wrongful death judgment.
Significantly, in resting their defense on appeal on the causation issue, Appellants effectively concede the breaches of the standards of care in Jody’s treatment as expressed by the findings of the medical review panel and Plaintiffs’ experts. Indeed, the testimony of treating Nurse Vercher established that Jody was an “unstable patient” who “needed immediate attention.” The nurse admitted that he did not inform Dr. Paul of the fact | sthat Jody did not have a spleen and noted his understanding that Jody could die if she left the hospital with an untreated bacterial infection. Despite this fact, the nurse did not express any concern over Jody’s ultimate *83 discharge, although he was aware that her heart rate had elevated. It is apparent that Jody’s temperature was not taken during the latter part of her visit. In his testimony, the nurse concluded that if Dr. Paul “had one piece of the historical information” about the splenectomy, “we would have had a different outcome.”
Likewise, Dr. Paul admitted that he breached the standard of care in failing to determine that Jody did not have a spleen. He conceded that an untreated bacterial infection in an asplenic patient “could be catastrophic” and that if he had known her condition he would have admitted her and “immediately administered antibiotics.” He testified that Jody’s white blood count showed a “left shift” which was possibly indicative of a bacterial infection and that Jody’s differential whole blood tests also revealed good markers for bacteria. Dr. Paul did not document tonsilitis.
To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794. The manifest error standard applies to the review of medical malpractice cases. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Benefield, v. Sibley, 43,317 (La.App.2d Cir.7/9/08), 988 So.2d 279, writs denied, 08-2162, 08-2210, (La.11/21/08), 997 So.2d 1107, 08-2247 (La.11/21/08), 997 So.2d 1108; Wiley v. Lipka, 42,794 (La.App.2d Cir.2/6/08), 975 So.2d 726, writ denied, 08-0541 (La.5/2/08), 979 So.2d 1284; Little v. Pou, 42,872 (La.App.2d Cir.1/30/08), 975 So.2d 666, writ denied, 08-0806 (La.6/6/08), 983 So.2d 920.
In order to reverse a factfinder’s determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfin-der is clearly wrong or manifestly erroneous. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Benefield, supra. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Where the factfinder’s conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Benefield, supra; Wiley, supra. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the verdict. It must instead review the record in its entirety to determine whether the verdict was clearly wrong or manifestly erroneous. Peterson v. Gibraltar Sav. and Loan, 98-1601, 98-1609 (La.5/18/99), 733 So.2d 1198; Bellard v. Willis Knighton Medical Center, 34,360 (La.App.2d Cir.5/9/01), 786 So.2d 218, writ denied, 01-1686 (La.9/21/01), 797 So.2d 676; Currie v. Myers, 32,633 (La.App.2d Cir.1/26/00), 750 So.2d 388, writ not considered, 00-0665 (La.3/17/00), 756 So.2d 316.
It is well settled that a hospital is liable for its employee’s negligence, including its doctors and nurses, under the re-spondeat superior doctrine. In a medical malpractice claim against a hospital, the plaintiff is required to prove by a preponderance of the evidence, as in any negli *84 gence action, that the defendant owed the plaintiff a duty to protect against the risk involved (or the applicable standard of care), and the injury was caused by the breach. Benefield, supra; Little, supra. Whether an emergency room physician is an employee or an independent contractor is a factual issue turning on the control exercised by the hospital over his activities. Wright v. HCA Health Services of LA 38,427 (La.App.2d Cir.6/23/04), 877 So.2d 211; Campbell v. Hospital Serv. Dist. No. 1, Caldwell Parish, 33,874 (La.App.2d Cir.10/4/00), 768 So.2d 803, writ denied, 00-3153 (La.1/12/01), 781 So.2d 558; Powell v. Fuentes, 34,666 (La.App.2d Cir.5/9/01), 786 So.2d 277, writ denied, 01-1675 (La.9/21/01), 797 So.2d 674. The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis. Wright, supra; Powell, supra.
Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence |nwithout the guidance of expert testimony. Samaha v. Rau, 07-1726 (La.2/26/08), 977 So.2d 880; Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228. Expert testimony is also required to establish whether a breach of the standard of care caused injury to the plaintiff. Schultz v. Guoth, 10-0343 (La.1/19/11), 57 So.3d 1002.
Nurses who perform medical services are subject to the same standards of care and liability as are physicians. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Little, supra; Wright, supra;
The claim that a defendant caused the decedent’s death is not the same as the claim that the defendant caused a loss of a chance to survive. The two theories of injury are distinct. Where the evidence could support either a theory that the defendant’s conduct caused the decedent’s death (making full wrongful death damages appropriate) or a theory that the defendant’s conduct caused the decedent a loss of a chance of survival, Louisiana law is clear that only one kind of damages or the other may be awarded. Coody v. Barraza, 47,732 (La.App.2d Cir.3/6/13), 111 So.3d 485. The lost chance of survival in professional malpractice cases has a value in and of itself that is different from the value of a wrongful death or survival claim. Smith, supra.

112Causation

Dr. Richard Sobel, an expert in emergency medicine, testified on behalf of Plaintiffs. At admission, Dr. Sobel characterized Jody as a “red zone” patient who was “unstabilized” and in need of immediate attention by a physician. According to Dr. Sobel, the fact that Jody did not have a spleen was vital to her history because the spleen is part of the immune system, a lymphatic organ that filters the blood and “attacks bacteria that has capsules.” He explained that these include the meningo-coccus or streptococcus bacteria which cause meningitis, strep throat and pneumonia.
Dr. Sobel characterized Jody’s vital signs as “very, very abnormal” and concluded that vital signs were important to her treatment options and diagnosis.
At 11:12 p.m., Jody’s blood pressure was “a little low,” and her fever had dropped. Her heart rate of 135 was better, but Dr. *85 Sobel stated that despite the administration of fluids, “it’s still not good.”
Dr. Sobel testified that Jody had “a classic picture for meningitis and also a strong possibility of blood stream infection, that’s called sepsis.” A spinal tap was required because of this possibility and Jody’s lack of a spleen. Dr. Sobel testified that “this type of patient with no spleen and a history of Hodgkin has to be given IV antibiotics very rapidly or she could deteriorate due to a delay in getting IV antibiotics.” Dr. Sobel characterized Jody as a complicated patient who should have been stabilized with antibiotics, fluid and a consultation with internal medicine, infectious disease or an oncologist considering her Hodgkin history. He testified that | ^antibiotics should have been administered expeditiously regardless of whether meningitis was ultimately diagnosed.
Dr. Sobel testified that Jody’s condition at 2:17 a.m. was “extremely worrisome” especially due to the “persistent tachycardia,” or heart racing. He stated that her hypotension was a new emergency condition which required screening and stabilization, but not discharge of the patient. In Dr. Sobel’s opinion, Jody was never a candidate for discharge and she should have been admitted to the hospital.
Dr. Sobel also indicated that Jody’s lab tests were “very non-reassuring” and that he believed there was “considerable negligence” on the part of Dr. Paul in interpreting the laboratory tests.
Dr. Sobel discussed Jody’s white blood count which he described as “super high.” He testified that Jody’s results included a left shift, meaning that 96% of the cells were leucocytes or white cells that defend against bacteria. He explained that lymphocytes defend viral infection. Dr. Sobel explained that Jody also had toxic granulation, meaning that bacteria had been swallowed up by a white blood cell and digest ed leaving pieces of bacteria in the white blood cell. Dr. Sobel testified that this is “more evidence to the emergency physician that we should really presume that this patient is very sick, septic.” Dr. Sobel believed “within a reasonable medical certainty” that Jody had bacteria in the bloodstream.
Dr. Sobel was of the opinion that Dr. Paul should not have administered Lopres-sor for Jody’s tachycardia because that drug did not address the underlying cause, is not indicated for tachycardia and can cause |14Iow blood pressure even though she was given more fluid. In this case, the Lopressor lowered Jody’s blood pressure and caused her to be unstable. Upon Jody’s actual discharge from the hospital at 3:03 a.m., her blood pressure had fallen to 87/52. Further, Jody’s heart rate did not respond appropriately to the Lopres-sor because it was still 133. Dr. Sobel testified that by definition, Jody was in shock at discharge.
Dr. Sobel testified that he did not understand why “the nurse just didn’t say, stop, this patient can’t go, these vital signs are abnormal.” He stated that “this nurse by policy and procedure” should have known that “you can’t send a patient out like this,” and should have made sure that her blood pressure was coming back up and not going down further. Dr. Sobel testified that “neither the nurse nor the doctor stopped the discharge of an unstable patient.” He indicated that temperature was a large issue which should have been monitored repeatedly after it was last recorded at 11:12 p.m. and finally checked at 3:00 a.m. before discharge.
Dr. Sobel explained that emergency physicians are specially trained to make a diagnosis of “worst first scenario.” He testified that in his opinion Jody was at high risk for sepsis causing clinical illness *86 and that Dr. Paul should have presumed sepsis considering Jody’s symptoms and history. He testified that she had SIRS, or a systemic inflammatory response syndrome. He explained that hospitals have created protocols to address this type of situation, called sepsis protocols, which include the administration of antibiotics.
11sDr. Sobel was of the opinion that Jody did not have bilateral adrenal hemorrhage while she was initially in the emergency room. He explained that an adrenal hemorrhage is a “preterminal event” which occurs late on and before death. He stated that “if the adrenal glands are subject to sepsis, to disorders of coagulation, clotting factor loss, to prolonged hypotension” then adrenal hemorrhage can occur. Dr. Sobel testified that in his opinion, “had they medically intervened by giving her fluids, antibiotics, it’s my opinion that more likely than not it wouldn’t have happened because it’s rare.” Regarding the standard of care, he concluded that the violations “caused harm and led to her ultimate demise.”
Dr. Sobel admitted that he could not “completely eliminate” the possibility that Jody had a virus but he believed that she had sepsis. He admitted that none of Jody’s tests showed bacteria in the blood stream, but they suggested such. He also explained that the lack of lab tests showing bacteria was not unusual. Although Dr. Sobel conceded that the autopsy did not reveal the presence of bacteria in the blood, urine or cerebral spinal fluid, he testified that there were some findings in the autopsy “that suggested] bacterial infection.”
The Defendants presented the testimony of Nurse Susan Cash, corporate director of emergency services for WK, who was qualified as an expert in nursing and emergency department. Nurse Cash testified that in her opinion, Nurse Yercher did not breach the standard of care in his treatment of Jody and that Jody was stable at the time of her discharge. She understood that Nurse Vercher informed Dr. Paul that even after his | Hidischarge order, Jody did not feel well. This information precipitated Dr. Paul to order Lopressor. Nurse Cash testified that these facts did not indicate to her that Jody was not stable.
Dr. Richard Kamm, expert in critical care medicine, pulmonary disease and internal medicine, testified on behalf of the defense. He agreed that Jody presented with signs of SIRS, namely a heart rate greater than 90, temperature, high respiratory rate and an elevated white blood cell count. He also conceded that Jody’s white blood cell count presented a left shift. He stated that with Jody’s complaints of a headache, Dr. Paul correctly ruled out meningitis. Dr. Kamm testified that Jody could not have been saved if she had been hospitalized due to the bilateral adrenal hemorrhage which is frequently catastrophic. He testified that Jody was stable and a candidate for discharge.
Dr. Kamm indicated that “a virus syndrome” would have been “high” on his differential analysis when Jody presented to the emergency room the first time. Dr. Kamm testified that SIRS can be triggered by a number of processes including viral or bacterial infections. He indicated that it was very important for a doctor to see a patient before making a diagnosis. He indicated that Jody did not have sepsis because there was no documented evidence of an active infection. Dr. Kamm noted that Jody’s blood work did not show infection and that in a patient with “overwhelming bacterial infection” he would expect a blood culture to respond. Dr. Kamm explained that bandemia are immature white blood cells which fight an acute infection. He did not recall that Jody’s blood work showed bandemia.
*87 117Pr. Kamm explained that sepsis is an infection of the blood that can be bacterial or fungal and it can be caused by “viral syndromes.” He testified that the potential that Jody had a virus was much higher because there was no clear evidence of bacteria. Dr. Kamm testified that antibiotics do not treat a virus.
Dr. Kamm pointed out that Jody’s renal function (creatinine level) was normal when she was initially tested at 9:00 p.m. Upon her return to the hospital, however, her creatinine level had doubled, indicating that her kidney function was cut in half. Dr. Kamm testified that the number one predictor of patient death in intensive care is acute renal failure. Dr. Kamm believed that something “critical,” including renal failure, happened to Jody after she left the hospital.
Dr. Kamm discussed a left shift in the white blood cell count which indicates bacterial infection. He testified that a right shift indicated viral. Dr. Kamm recalled that Jody had a left shift on her first visit which could be indicative of bacterial infection. However, he reported that upon her return to the hospital, Jody had a right shift which indicated a predominance of lymphocytes, used to fight viral infection. It was significant to Dr. Kamm that Jody’s blood work indicated a right shift upon her return because it moved him away from an opinion that she had a bacterial infection.
Dr. Kamm could not say when Jody developed the bilateral adrenal hemorrhage. He testified that the condition was very rare and that he only had one patient who survived it because “we had a strong pre-clinical suspicion” that the patient suffered from the condition. Dr. Kamm’s report 118and conclusions were introduced into evidence wherein he concluded that “Mrs. Bolton’s chances of survival on April 10, 2009 were exceedingly low, irrespective of admission to the hospital or administration of antiobiotics.” He did not believe that Jody had sepsis.
Dr. Kamm admitted that Jody’s temperature was not documented upon her discharge. He stated the intubation can cause irritation in the throat and that exudate on the tonsil was possible in this ease because of it.
Contrary to the Defendants’ assertions, we find that in its entirety Dr. So-béis testimony sufficiently reflects that the medical malpractice in this case caused Jody’s death.[7] His opinion established that despite Jody’s asplenic condition, immediate actions, including the administration of IV antibiotics, were not taken upon her admission on the evening of April 9 and that those actions, more probably than not, would have prevented death. Important to that expert view was Dr. Sobel’s conclusion that the septic shock which led to death was probably caused by a bacteria infection. This opinion was supported by Jody’s initial white blood count, an objective fact which the medical expert analyzed and explained.
While we have thoroughly examined the opposing medical opinion of Dr. Kamm which rested upon his belief that a viral infection was involved, the jury’s choice of Dr. Sobel’s analysis of the medical facts for a bacterial infection is not clearly wrong. Moreover, their choice regarding Jody’s greater than 50% chance of survival was not unreasonable and means that |1flher cause of death can be attributable to Dr. Paul’s admitted negligent inactions.
*88 We also find that the jury’s finding of fault on the WK nursing staff may also not be reversed under the manifest error standard. The monitoring of the patient and reporting to Dr. Paul of Jody’s change in condition in the final hours before her discharge could be considered as a contributing cause with Dr. Paul’s inac-tions that led to Jody’s death.

Admissibility of Exhibits

In their assignment of error, Defendants argue that the trial court erred in admitting certain of Plaintiffs’ exhibits into evidence after the close of evidence including a funeral bill, family photos and expert reports.
After the completion of Dr. Sobel’s testimony at the end of Plaintiffs’ case, the trial court removed the jury from the courtroom and made- the following statement:
Let the record reflect that the jury is out of the courtroom and just for clarification, the Court has allowed Plaintiffs’ counsel to rest subject to further instructions of the Court, and those instructions had to do with we’ll ensure that all of his exhibits and whatnot have been properly admitted and accepted according to the clerk. I don’t want to stop and do that at this time, but at this time the Court notes that the plaintiff has rested.
No objection to the ruling was made by the defense.
After completion of the entire case, the trial court indicated that “housekeeping” matters remained including the introduction of any remaining exhibits by the Plaintiffs. The defense objected to the introduction of a funeral bill, family photographs, Dr. Sobel’s expert report and the expert reports of three other experts on the grounds of hearsay due |2nto the fact that the exhibits were not introduced contemporaneously with testimony. The trial court overruled the objection and allowed Plaintiffs to introduce the exhibits.
One of the subject exhibits includes a funeral home invoice for Jody’s funeral costs. Upon Defendants’ objection, the Court indicated that it would allow the Plaintiffs to bring a witness in to introduce the document. Thereafter, Plaintiffs offered a stipulation that Tommy Bolton would testify that the “funeral bill to Mulhearn’s Funeral Home was a total amount of $12,392.” The Defendants lodged no objection to the stipulation, but re-urged the hearsay objection.
The trial court has great discretion in controlling the conduct of the trial and the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence. La. C.C.P. art. 1632; Bickham v. Riverwood Int'l. Corp., 42,122 (La.App.2d Cir.10/8/07), 966 So.2d 820; Robinson v. Healthworks Int’l., L.L.C., 36,802 (La.App.2d Cir.1/29/03), 837 So.2d 714, writ not considered, 03-0965 (La.5/16/03), 843 So.2d 1120; White v. McCoy, 552 So.2d 649 (La.App. 2d Cir.1989).
Funeral expenses are an element of wrongful death damages. Hebert v. Webre, 08-0060 (La.5/21/08), 982 So.2d 770; Clark v. G.B. Cooley Service, 35,675 (La.App.2d Cir.4/5/02), 813 So.2d 1273. Third party bills and invoices are admissible to prove the amount of damages if shown to be trustworthy. Bishop v. Shaw, 43,137 (La.App.2d Cir.3/12/08), 978 So.2d 568; Ollis v. Miller, 39,087 (La.App.2d Cir.10/29/04), 886 So.2d 1199. Testimony of the individual who received and paid the invoices is |21 sufficient to show the expenses or damages, but not that the services were necessary or reasonable. Ollis, supra. In this case, Defendants offered no objection to Plaintiffs’ stipulation regarding the amount of funeral costs ex *89 pended by Tommy who was apparently present in the courtroom to testify. Thus, those costs were properly established and submitted to the jury.
Defendants also complain about the trial court’s admission into evidence of a CD containing family photographs after the close of the case. The record shows, however, that at the close of Plaintiffs’ case, counsel requested to show “some family photographs” contained on a photographic slide show, without testimony. No objection was lodged by the Defendants and after the photographs were shown to the jury, Plaintiffs rested. An objection to a witness or to the introduction of evidence is waived if the objection is not raised at a time when the error can be corrected. Kose v. Cablevision of Shreveport, 32,855 (La.App.2d Cir.4/5/00), 755 So.2d 1039, writ denied, 00-1177 (La.6/16/00), 764 So.2d 964; Briscoe v. Briscoe, 25,955 (La.App.2d Cir.8/17/94), 641 So.2d 999. Thus, the lack of defense objection at the time of the jury’s viewing of the evidence precludes review of this issue.
Finally, Defendants complain about the introduction of the expert report and life care plan of economic expert, Dr. Doug Womack, a separate life care report of Dr. Cornelius Gorman, life care plan and vocational | ^rehabilitation expert, the expert report of Dr. Savant and Dr. Sobel’s curriculum vitae,[8] report and graph.
The record shows that Dr. Gorman’s testimony consisted mainly of his explanation of the information and conclusions contained in his report which he identified and which was shown to and reviewed by the jury and counsel. After the Plaintiffs completed questioning Dr. Gorman, counsel attempted to introduce the report into evidence upon defense objection. However, the report was not introduced into evidence at that time. Defendants proceeded to cross-examine the witness.
Dr. Shelley Savant, expert in general neurology and general psychiatry, assisted Dr. Gorman in the development of Luke’s life care plan and conducted a neurological and psychiatric evaluation of the child. At trial, Dr. Savant testified to her findings while referencing her report. No reference is contained in the record regarding the jury’s exposure to the report during the testimony. The defense conducted cross-examination of the witness partly from the information contained in the report.
Relating to Dr. Womack’s reports, the jury was allowed to review the documents from which Dr. Womack identified and painstakingly testified. Likewise, the defense was afforded complete cross-examination of the expert.
After Dr. Sobel’s qualification, Plaintiffs examined him regarding his report which included a graph. Dr. Sobel identified the report which he | ^discussed in his testimony. The witness also discussed the graph. Dr. Sobel was cross-examined extensively about his conclusions.
We find no error in the trial court’s admission of these documents into evidence. The record before us clearly shows that during the testimony of each witness, the subject reports and documents were identified and reviewed. The witnesses’ memories were effectively refreshed. See La. C.E. art. 612. Thus, regardless of the timing of their admission into evidence, these documents were properly authenticated through the testimony of their preparers. Moreover, most of the *90 documents were viewed by the jury without objection from the defense. Ultimately, any technical error in the unorthodox introduction of evidence was harmless considering the cumulative nature of the evidence received. Welch v. Willis-Knighton Pierremont, 45,554 (La.App.2d Cir.11/17/10), 56 So.3d 242, writs denied, 11-0075 (La.2/25/11), 58 So.3d 457, 11-0109 (La.2/25/11), 58 So.3d 459; Graves v. Riverwood Int’l. Corp., 41,810 (La.App.2d Cir.1/31/07), 949 So.2d 576, writ denied, 07-0630 (La.5/4/07), 956 So.2d 621.

Expert Witness Fees/Costs

After trial, Plaintiffs filed a Motion to fix expert witness fees and costs requesting in relevant part the expert witness fees of Drs. Savant, Gorman, Womack and Sobel. At a hearing on the motion, the Plaintiffs presented no testimony but rather relied on invoices submitted by the experts to Plaintiffs’ attorney in proof of their claims. After taking the matter under advisement, the trial court awarded the following expert witness fees:
|9/lPr. Shelley Savant, M.D. $ 6,000
Dr. Cornelius E. Gorman, Phd ... $12,400
Dr. Douglas Womack, Phd. $ 3,150
Dr. Richard Sobel, M.D. $41,265
Defendants argue that the trial court erred in assessing the expert fees “solely on assertions of Plaintiffs counsel and the purported invoices of Plaintiffs experts.”
Regarding costs, La. R.S. 13:3666 provides in relevant part:
A.Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.
C. In either manner provided in Subsection B, the court shall also determine and tax as costs, to be paid by the party cast in judgment, the reasonable and necessary cost of medical reports and copies of hospital records.
An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. The trial judge is not required to set an expert fee at the amount charged by the expert witness. The trial judge has great discretion in awarding and fixing costs and expert witness fees. A trial court’s assessment of costs can be reversed by an appellate [ 2fiCourt only upon a showing of abuse of discretion. Allstate Enterprises, Inc. v. Brown, 39,467 (La.App.2d Cir.6/29/05), 907 So.2d 904; City of Shreveport v. Chanse Gas Corp., 34,958, 34,959 (La.App.2d Cir.8/22/01), 794 So.2d 962, writs denied, 01-2657, 01-2660 (La.1/4/02), 805 So.2d 209. Factors to be considered by the trial judge in setting the expert witness fee include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to *91 testify, the extent and nature of the work performed and the knowledge, attainments and skill of the expert. Additional considerations include helpfulness of the expert’s report and testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Allstate Enterprises, Inc., supra; Smith v. Scott, 26,849 (La.App.2d Cir.5/10/95), 655 So.2d 582, writ denied, 95-1450 (La.9/22/95), 660 So.2d 475.
In this matter, at the hearing on the rule to fix costs, the parties stipulated to the reasonableness of Dr. Savant’s fee at $6,000, the amount the court awarded. Nevertheless, the defense objected to the manner of proof on the grounds of hearsay. The hearsay objection was properly rejected as Dr. Savant’s invoice was made out to Plaintiffs’ attorney who was available for questioning before the trial court.
Plaintiffs requested the sum of $17,900 for Dr. Gorman’s services which included costs for preparation of Luke’s lifecare plan of $11,400, trial preparation, $1,500 and trial testimony of $5,000 as evidenced by the invoice submitted at the hearing. The defense objected to the invoice on the | ¾; grounds of hearsay and on the grounds that the lifecare plan for Luke would have been required regardless of his mother’s death. Ultimately, the defense argued that the lifecare plan and report should be valued at $125 and that Dr. Gorman should not be compensated at the same rate as a medical doctor and should be awarded only $1,600 for trial testimony. The defense proposed that the sum of $4,575 was a proper fee for Dr. Gorman.
Plaintiffs requested the sum of $4,350 for the services of Dr. Womack which included $3,000 for trial testimony, $950 for his lost income report and $400 for a deposition. The defense objected to the deposition on the grounds that it was not introduced at trial. At trial, Dr. Womack testified that he charged $800 for the first hour and $400 per hour after that for trial and deposition testimony. He also testified that for his reports, he charged from $950 to $1,500 per report. He indicated that his daily trial rate for testimony was $3,000.
Finally, Plaintiffs sought the sum of $51,325 for Dr. Sobel’s expert services. The defense objected on the grounds of hearsay and the reasonableness of the fees. At trial, Dr. Sobel testified that his hourly rate was $375 and that he charged $4,500 a day for trial testimony. For depositions, he testified that he charged $600 per hour.
When viewing the evidence and testimony as a whole we find the amounts awarded by the trial court to be reasonable. Evidence on the record established each expert’s hourly and trial rates. Further the trial court judgment evidences the trial court’s consideration of each expert’s contribution to the trial as well as the amount of time each spent on the 127stand. When considering witnesses’ expertise and the complexity of the required analysis required of each, we cannot say that the trial court abused its wide discretion in fashioning the costs awarded. For these reasons, the cost judgment is affirmed.

Conclusion

For the reasons stated above, the jury verdict and cost judgment are affirmed. Costs of this appeal are assessed to Defendants.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY, DREW and MOORE, JJ.
| xRehearing denied.

. The medical records indicate that Dr. Paul read the nurses' history report at 1:30 a.m. He concedes that he remained unaware of Jody’s splenectomy.

. The first mention of Dr. Paul's face-to-face meeting with Jody is contained in Nurse Vercher’s note of 10:18 p.m. and Dr. Paul's note of 10:19 p.m., when Jody was "medically screened.”

. The test did not rule out viral meningitis which does not cause cloudy spinal fluid.

. The expert testimony indicates that a differential diagnosis is a diagnosis made when the exact cause of the patient’s symptoms cannot be determined.

. The medical review panel opinion was admitted into evidence at trial pursuant to La. R.S. 40:1299.47 H. None of the panel physicians testified at trial.

. The Louisiana Patients Compensation Fund ("PCF") has intervened and adopts the arguments of Defendants for purposes of this appeal. Additionally, the Plaintiffs also raised assignments of error in brief. Because no answer was filed, however, review of these issues is precluded. La. C.C.P. art. 2133.

. In Dr. Sobel’s written report which was allowed in evidence as a Plaintiffs’ exhibit, he specifically stated, “More likely than not and with reasonable medical certainty, Ms. Bolton would have survived her illness that is sepsis.” Defendants’ argument contesting the admission of that exhibit is discussed below.

. At the time of the introduction of the report into evidence, Defendants lodged no objection to the introduction of Dr. Sobel’s curriculum vitae into evidence. Thus, they are precluded from raising this issue on appeal.