DREW, J.
| Jn this medical malpractice action, William Blake Bailey (“Blake”) and his mother, Rhonda Moore, appeal a judgment dismissing their claims against the Town of Homer following a trial on the merits.
We affirm.
FACTS
On the afternoon of Friday, February 13, 2004, 11-year-old Blake went to the home of his grandmother, Joyce Rawls, with whom he was temporarily living. Rawls gave Blake a Tylenol because he complained of a headache. She recalled that Blake slept most of Saturday. Blake, *325 who did not eat regularly that Saturday, began vomiting on Sunday morning.
That Sunday afternoon, Rawls decided to take Blake to the emergency room at Homer Medical Hospital (“HMH”). Blake had a recent history of going to the ER there.[1] Rawls recalled that Blake slept while in the waiting room. A history of headaches and vomiting was given to the ER doctor. Rawls was also concerned that Blake had not urinated that day. Blake was admitted to HMH for treatment of acute gastritis and volume depletion. IV fluids of lOOcc per hour were ordered, along with Pepcid and Phenergan.
|2The attending nurse noted that Blake was asleep with a sound rest pattern at 6:30 p.m. Blake was found to arouse easily at 8:30 p.m. He complained of a headache, and a low-grade fever was noted.
At 10:30 p.m., Blake was quiet and without discomfort. He was given Motrin an hour later for headache pain and because his temperature had risen to 100.6 degrees.

Monday, February 16

At 1:45 a.m., Blake’s temperature was down to 99 degrees, and he did not have nausea. He was resting on his side without nausea at 4:00 a.m. Tylenol was given at 6:25 a.m. for headache pain.
The nurse found Blake alert, awake, and oriented at 8:00 a.m. He was tolerating clear liquids, with no apparent complaint or distress.
When Blake’s regular physician, Dr. James Smith, began rounds at approximately 7:30 that morning, he did not know that Blake had been admitted because his chart was not in a rack when Dr. Smith went to the nurses’ station. Dr. Smith was told by a nurse later that morning that Blake was a patient at the hospital.
The nurse noted at 10:00 a.m. that Blake’s grandfather was concerned about him. He had continued headaches and a sleepy feeling. After Dr. Smith was notified, he called 50 minutes later for a report on Blake. Dr. Smith ordered a bolus of IV fluid and continued IV fluids of 200cc per hour following the bolus. The bolus was started at 11:00.
Rawls had remained with her grandson since his admission, but was relieved on Monday afternoon by Blake’s mother, Rhonda Moore.
| sBlake required assistance to walk to the bathroom at 12:30 p.m. Dr. Smith saw Blake while doing rounds at lunchtime. Dr. Smith believed Blake was feeling better, was hungry, and had improvements in his nausea and vomiting symptoms. He anticipated that Blake would continue to improve with rehydration, and he requested a regular diet for Blake. Blake was assisted to the bathroom again at 1:00 p.m. Blake vomited a moderate amount at 2:35 p.m. He received Phenergan five minutes later. By 4:00 that afternoon, Blake was lying in bed with his eyes closed and without any signs or symptoms of nausea.
Dr. Smith saw Blake next when he did rounds at approximately 6:00 that evening. He asked the nurses to unhook the IV so *326 Blake could change shirts. A complete blood count with renal tests was planned for Tuesday morning. At 7:25 p.m., Dr. Smith ordered the administration of Demerol every four hours as needed.
Blake was sleeping soundly at 7:30 p.m., but his family was concerned that he was too sleepy and groggy. According to Rawls, Blake had been lethargic and unresponsive since arriving at the hospital. The attending nurse, Renee Mills, noted that Blake aroused when touched and was spoken to, and he opened his eyes and followed commands with no complaints at the time. Blake answered yes when asked if his head was hurting. Nurse Mills took his vital signs at 8:15 p.m.
At 10:10 p.m., 12.5 mg of Demerol was administered by IV for complaints of headaches. The IV was unhooked so Blake could change his shirt.
[4Moore called the nurses’ station at 11:50 p.m. to report that Blake had a seizure (“first incident”). According to Moore, Blake also wet the bed, and it took Mills over 20 minutes to come to the room. Mills stated that it would probably take less than a minute to get to the room from the nurses’ station, and she would respond as soon as she could if someone called from a patient room and was upset or panicked. Mills observed Blake grabbing his mother’s arm and pulling her shirt. Mills found Blake to be easily aroused and able to move all extremities. He was sleepy and groggy, but was able to follow commands. Mills checked his vital signs at midnight.

Tuesday, February 17

Moore called the nurses’ station again at 1:45 a.m. (“second incident”) to report that Blake was having a seizure. Again, according to Moore, Blake wet the bed and it took 30 minutes for Mills to respond to this second report of seizure. Blake was very still when Mills entered the room. Mills found that Blake aroused when his name was called and opened his legs when asked to. It was noted that Moore said Blake was stiff, but Mills found him to be very flexible. He pulled himself up in bed when asked, was in control of his bowels and bladder, and opened his mouth and lifted his tongue when asked. Blake also knew who Moore was. Mills noted that she did not see any signs or symptoms of seizure activity.
Mills found Blake asleep at 3:00 that morning. She found him awake at 5:00 a.m. without complaints of headaches. He had wet his bed, so his linens and clothes were changed. Moore claimed that she reported a third seizure episode around this time (“third incident”), although this is not | ¡¡reflected in the nursing records. Motrin was given at 6:55 a.m. Mills went off her shift five minutes later.
Dr. Smith was notified of what had happened during the night when he began rounds at approximately 7:00 that morning.
The nurse recorded that Blake was lying in bed, but was lethargic and difficult to arouse at 7:50 that morning. Tylenol was given for fever at 8:10 a.m. Dr. Smith saw Blake shortly thereafter, and he noted that Blake’s mother was convinced that Blake was having seizures. The doctor also noted that Demerol and Phenergan contributed to his sleepiness, although he was arousable, followed commands, and responded appropriately throughout the night. Dr. Smith further noted that Blake had wet the bed twice during the night. Dr. Smith’s diagnosis continued to be acute gastroenteritis with recurrent nausea and vomiting and persistent fever, and headache contributing and/or related to the GI diagnosis.
At 8:50 a.m., Dr. Smith ordered the IV fluid rate lowered to 75cc per hour. More importantly, because Blake had wet the *327 bed, Dr. Smith ordered a CT scan of Blake’s head and sinuses and asked the radiologist to call him with the results. Blake remained difficult to arouse at 9:30 a.m.
The radiologist discussed the CT scan findings with Dr. Smith at 10:80 a.m. The scan showed an acute right thalamic hema-toma. The radiologist noted that it was an extremely unusual finding in a pediatric patient. Dr. Smith began working on transferring Blake to LSUHSC-Shreve-port (“LSU”).
At 10:40 a.m., Blake responded to tactile stimuli and opened his eyes, but remained lethargic. At 11:30 a.m., Blake was more difficult to arouse, Rbut would arouse to sternal rub. At 12:40 p.m., Blake would not arouse to sternal rub, so Dr. Smith was paged on his beeper. At 1:00 p.m., Dr. Smith returned the call and said they were awaiting word from doctors at LSU. The next hour, Dr. Smith ordered the administration of Decadron and Mannitol.
Dr. Smith noted that it was not easy to make the transfer since LSU’s bed status was not optimal. The pediatric neurosurgery department eventually agreed to accept Blake to the burn unit ICU for close management and placement of a drainage tube. Blake arrived at LSU by ambulance at approximately 4:00 p.m.
Dr. Smith noted that at the time of the transfer, Blake was arousable although more lethargic than he had been. The diagnoses on discharge were (1) right tha-lamic intracerebral hemorrhage with obstruction of drainage from right ventricle causing obstructive hydrocephalus; (2) progressive decreased level of consciousness secondary to No. 1; and (3) nausea, vomiting, and anorexia secondary to No. 2.
Doctors at LSU unsuccessfully attempted a right frontal ventriculostomy[2] at 6:30 that evening. A CT scan of the head done at 10:46 p.m. showed right thalamic hema-toma, compression of the third ventricle, midline shift, hydrocephalus, and a post-surgical track.

Wednesday, February 18

|7An MRI of the brain done in the morning showed a large right thalamic hemato-ma and swelling, ventricular compression and midline shift, and post-surgical linear track. A CT scan of the head done just after noon showed right thalamic and sub-thalamic hematoma, and an interrupted path with some blood content going through the right frontal lobe arising from a burr hole.
At 3:30 p.m., doctors at LSU successfully placed a shunt. A post-surgical CT scan of the head showed placement of a shunt, but no other significant changes from the day before. The ventricles were still dilated, and the large right thalamic hematoma, swelling, and compression remained unchanged.
Blake remained at LSU for approximately a month. He was then transferred to Willis-Knighton North for several weeks of rehabilitation. After being discharged home, Blake began receiving rehabilitation in Ruston.
Dr. Aristotles Pena-Miches, who examined Blake on September 23, 2009, diagnosed Blake as having hemidystonia hemi-paresis, weakness in the left side with decreased dexterity of the extremity, sensory loss in the left forehead, and dystonia, or abnormal posture of the left hand, as a result of the damage done to his brain. The fingers on Blake’s left hand are far apart, and he has difficulty opening and closing the hand. His left arm sometimes *328 involuntarily flexes when he is nervous. The toes on his left foot curl under, with his big toe sticking up, so Blake cannot run swiftly,, and he has trouble walking up stairs. Although future physical therapy will not help his deficit as it is permanent, it will help him maintain dexterity, avoid permanent | ^skeletal contractures, and develop compensatory mechanisms. Dr. Pena-Miches did not think all of Blake’s deficits had been uncovered. Blake also has, post incident, a history of temper outburst, is easily frustrated and more impulsive, and has trouble with his short-term memory. Blake now draws social security disability.
PROCEDURAL HISTORY
Blake and his mother contended that Dr. Smith failed to appropriately evaluate, diagnose, and treat Blake’s condition, and believing that Blake only had a stomach ailment, he refused to perform diagnostic studies including a CT scan despite specific requests from Blake’s family.
As pertains to the nurses at HMH, Blake and his mother contended that the nurses negligently failed to timely and appropriately respond to the calls for assistance made by Moore on Monday night and Tuesday morning, and that they failed to timely notify a physician about the change in Blake’s condition.
A timely request for a medical review panel (“MRP”) was filed.
The MRP concluded that:
• Dr. Smith acted appropriately and timely on the information that he had;
• the doctor’s conduct was not a breach of the standard of care;
• it could not find the conduct of the nurses to be below the applicable standard of care, when using their skills . and best judgment in not reporting the seizure complaints to Dr. Smith or an on-call doctor during the night; and
• the notes of the nurses as to their observations when called to Blake’s room did not support a determination that seizures had occurred.
| ¡¡Moore, individually and on behalf of Blake, filed suit against Dr. Smith and the Town of Homer d/b/a Homer Memorial Hospital. Summary judgment was granted in favor of Dr. Smith, dismissing all claims against him.
Following a bench trial, the court ruled in favor of HMH.
The trial court concluded:
In this case, the evidence presented at trial and through deposition testimony does not support a finding that HMH was the cause-in-fact of Bailey’s injuries. Plaintiffs did not present sufficient evidence to show that HMH, its nurses, and/or staff caused Bailey’s injuries. To the contrary, the evidence showed that nothing HMH did caused the stroke. Additionally, Plaintiffs failed to offer any evidence that HMH’s care of Bailey worsened his injuries or resulted in a loss of chance of a better result.
Irrespective of whether the nurses were negligent in failing to call the doctor at some point during the night of February 16, the evidence presented at trial, as well as the deposition testimony submitted at trial, does not show that it would have made any difference in the plaintiffs condition. No evidence presented that the hospital nurses caused the plaintiffs stroke and no evidence shows that the negligence of the nurses, if any, caused plaintiffs chance of a better result was lessened.
Blake has appealed.
*329 DISCUSSION
Blake argues on appeal that the trial court was manifestly erroneous in: (1) not concluding that nurse Renee Mills was negligent when she failed to call a doctor about the changes in Blake’s condition, which delayed the CT scan, and (2) failing to find that the negligence of HMH caused Blake to suffer harm that he would not have otherwise suffered or lessened his chances of a better result.
|1f>At trial, the court heard testimony from Blake, Moore, Rawls, and Mills. In addition, the trial court was presented with depositions from one nurse consultant[3] and six medical doctors. It was not disputed that thalamic bleeds are rare in pediatric patients, and that nothing done at HMH caused the bleed. Of course, there was a dispute among most of the doctors concerning whether earlier diagnosis of the bleed would have resulted in a different outcome for Blake.
Dr. Gregory Phillips, a member of the MRP, was board-certified in family practice medicine. He believed that what Mills observed did not support the typical finding of a seizure. However, he would have expected a call from Mills after the second incident. Nevertheless, Dr. Philips believed that it was within Mills’ discretion whether or not to call a doctor, and her decision not to do so was not below the standard of care. Dr. Phillips did not have an opinion as to whether Bailey had a bad result because of the treatment he received at HMH.
Dr. William McBride was also board-certified in family practice and a member of the MRP. He preferred that nurses call him when a patient’s family was upset, but that did not necessarily mean there was a medical reason for the call. He would not have expected a nurse to call him based on what Mills recorded following the first and second incidents. Dr. McBride agreed that earlier detection of the bleed would not have made a difference, and he thought the outcome was good or very good considering the | T1 diagnosis. According to Dr. McBride, the need for placement of a shunt was not evident until right before Blake was transferred to LSU, and the placement of the shunt could not have been done at HMH.
Dr. John Smith, board-certified in family practice medicine, began treating Blake in 1999. Blake had frequent problems with headaches and abdominal pain. The cause of the headaches was never determined. Dr. Smith said that the on-call doctor should have been notified after the first incident because he wanted to be notified when a patient of his had a change in status. Dr. Smith also felt the on-call doctor should have been notified following the second and third incidents. In light of the severity of the headaches, progressive decreased levels of consciousness, and reports of seizure, the nursing staff should have informed the on-call doctor earlier about the changes in Blake’s condition.
Dr. Smith ordered the CT scan because Blake had wet the bed. HMH did not have a staff radiologist, but CT scans could be examined over a phone or the internet. Dr. Smith explained that Blake had a small bleed that went undiagnosed over a period of 24-36 hours until it got large enough to cause a midline shift and severe compression of the third ventricle. The midline shift meant that bleeding and ede *330 ma had pushed the midline structures to the other side of the skull. The compression of the third ventricle created too much intracranial pressure because the cerebral spinal fluid could not drain.
Dr. Smith acknowledged that the nurses’ entries beginning at 9:30 a.m. on February 17 showed decreased levels of responsiveness by Blake that indicated a pattern of progressive deterioration. While Dr. Smith | ^believed that the brain abnormalities would have been detected if the CT scan had been performed during the night on February 16, which would have caused him to attempt the transfer earlier, he did not think that transferring Blake to a tertiary care center sooner would have affected the outcome.
Dr. Mahmoud Rashidi Naimabadi, a neurosurgeon with a specialty in pediatric neurosurgery, treated Blake at LSU. Dr. Rashidi had been asked by plaintiffs’ counsel to provide an opinion regarding the care and treatment rendered at HMH. Dr. Rashidi felt that based upon the progressive headaches, decreased levels of consciousness, and possible seizures, the nurses should have alerted the doctors sooner about the changes in Blake’s condition. Blake’s increased headaches and lethargy were related to the hydrocephalus. In addition, the nurses should have reported to a doctor that there was a total input of 2649cc of fluid and output of only 600cc during the first 24 hours of fluid administration. Administration of fluids at those levels, which Dr. Rashidi felt may have been done too aggressively, could have worsened the hydrocephalus.
Dr. Rashidi could not find the cause of the bleed, nor did he have an opinion as to its cause. He did not know when the bleed started, and he felt it was possible that it originated before Blake went to HMH. According to Dr. Rashidi, the size of the bleed determines how long after it starts that a midline shift would appear on a CT scan.
Dr. Rashidi testified that if the CT scan had been run at midnight, it probably would not have changed the outcome, at least not significantly. An earlier CT scan may have found the hydrocephalus sooner, and the only |lsthing that would have changed was there may have been less effect from the hydrocephalus. The severity of the hydrocephalus would determine how much difference implanting the shunt earlier would have made to Blake’s prognosis, but Dr. Rashidi could not recall how severe the hydrocephalus was. Dr. Rashi-di agreed that based on the shunt being placed on Wednesday after Blake was transferred on Tuesday, the delay in ordering the CT scan at HMH probably did not affect Blake’s treatment or condition. Near the end of his deposition, Dr. Rashidi was asked if considering that Blake was at LSU for almost 24 hours before the shunt was placed, would the nine-hour delay in ordering the CT scan have changed any of Blake’s treatment or affected his outcome. Dr. Rashidi replied that one could not say for sure, and probably not.
Dr. Aristotles Pena-Miches was board-certified in pediatric neurology. He was asked by plaintiffs’ counsel to review the records in this matter.[4] He also examined Blake on September 23, 2009. He had offered to see Blake again, but Blake never took him up on the offer.
Dr. Pena-Miches opined that Blake had been misdiagnosed upon admission to HMH as he presented with a classical clinical picture of acute increased intracra-nial pressure but was instead diagnosed with gastroenteritis. He did not mean that the ER doctor should have diagnosed *331 the brain bleed, but he should have identified the symptoms of increased intracranial pressure.
Dr. Pena-Miches believed that Blake started having changes in mental status and nonconvulsive seizures on the day he was admitted to HMH. He 114thought that the brain was most likely already bleeding when Blake went to the ER, although there is no way to be certain of how long before. Dr. Pena-Miches opined that the hematoma kept increasing until the bleed was found because Blake’s condition continued deteriorating after admission to HMH. His conclusion was that the thalamic bleed grew, compressed neighboring structures, and caused the problems faced by Blake. Dr. Pena-Miches explained that if intracranial pressure is left unchecked, the chances of brain damage increase exponentially. He did not believe there was brain damage before Blake got to HMH based on the new symptoms that Blake developed there.
Regarding the care provided by the nurses, Dr. Pena-Miches testified that while the incidents on Monday night and Tuesday morning may not have appeared to be seizures to a layperson, a properly trained nurse would have immediately raised the alarm. Nurses are not supposed to diagnose, but are supposed to notify doctors so that a doctor can make decisions about the proper treatment.
Dr. Pena-Miches disagreed with Dr. Rashidi’s statement that the delay in ordering the CT scan did not affect the treatment provided to Blake. An earlier CT scan and earlier identification of the bleed would have completely changed the management of Blake’s condition, and more likely than not would have changed the outcome, although there is no way to tell how much it would have improved the prognosis. He explained that once a brain bleed is diagnosed and there is a space-occupying lesion, the patient needs to be sedated, have the head elevated, be confined to a bed, receive . anticonvulsion drugs, and not receive the level of fluids that Blake was fygetting. Serial imaging of the brain also needs to be done to exclude surgical intervention.
Dr. Robert Katz practiced as a pediatric intensivist. He also reviewed 20-25 potential malpractice cases a year, mostly for plaintiff lawyers.[5] Dr. Katz thought Dr. Smith’s treatment fell below the standard of care because Blake had a deteriorating neurological function and diagnostic studies were not done until his third day at HMH,[6] and because the IV regimen prescribed by Dr. Smith was incorrect and exacerbated the central nervous system problems. Dr. Katz also thought that the conduct of the nurses fell below the relevant standard of care because there were several situations, beginning with the first incident, when Blake’s neurological status should have been a concern, yet the nurses did not call a doctor.
Dr. Katz was not positive about what caused the thalamic bleed, but guessed that Blake had a congenital malformation of the artery that fed that part of the brain. He recognized there was no way to determine when the bleed started, although he assumed it started when Blake had the seizures or sometime before that. He believed the effect of the bleeding was made worse by the excessive IV fluids and the delay in diagnosing the bleed.
Dr. Katz explained that the amount of bleeding, whether there is an obstruction so that the cerebral spinal fluid cannot drain, and whether there is increased *332 swelling in the brain, impacts the evolution of a neurologic injury. Blake developed hydrocephalus from an obstruction to the drainage of cerebral spinal fluid as a result of the bleed and the midline shift. Dr. 11fiKatz believed that the fluid buildup happened slowly and Blake’s brain initially had time to compensate until its compensation mechanism stopped working.
Dr. Katz opined that while he did not know how much worse Blake’s condition was made by the delay and the excessive IV fluids, in all probability Blake would have had less residual damage with an earlier CT scan, and without receiving an extraordinary amount of fluids. Dr. Katz could not quantify how much less the damage would have been.
ANALYSIS
When a medical malpractice action is brought against a physician, the plaintiff must establish the standard of care applicable to the physician, a violation of that standard of care by the physician, and a causal connection between the physician’s alleged negligence and the plaintiffs resulting injuries. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; Johnson v. Morehouse Gen’l Hosp., 2010-0387 (La.5/10/11), 63 So.3d 87.
Nurses who perform medical services are subject to the same standards of care and liability as are physicians. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Bolton v. Willis-Knighton Med. Ctr., 47,923 (La.App.2d Cir.4/24/13), 116 So.3d 76, writs denied, 2013-1307, 2013-1308 (La.9/20/13), 123 So.3d 176.
117The standard of appellate review for medical malpractice claims was discussed by this court in Crockham v. Thompson, 47,505, p. 5-6 (La.App.2d Cir.11/14/12), 107 So.3d 719, 723-24:
The manifest error standard applies to the review of medical malpractice cases. A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Where the fact finder’s conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
Where there are conflicting expert opinions concerning the defendant’s compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact.
[[Image here]]
The appellate court must not reweigh the evidence or substitute its own factual finding because it would have decided the case differently. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.
Citations omitted.
As noted earlier, this case involves a mixture of live and deposition testimony. Fact finding is allocated to the trial court, and its evaluations of credibility, even when based on depositions offered in lieu of live testimony, are accorded great defer *333 ence. Virgil v. American Guarantee & Liab. Ins. Co., 507 So.2d 825 (La.1987). We are also mindful that appeals lie from judgments, not reasons for judgment. Retail Merchants Ass’n, Inc. v. Forrester, 47,936 (La.App.2d Cir.5/15/13), 114 So.3d 1175.
|islt is imperative to keep in mind that what is in dispute in this matter is not whether a delay in ordering the CT scan (as a result of Mills not calling the on-call doctor on Monday night or Tuesday morning) caused all of Blake’s damages. Damages were going to be suffered even if the CT scan had been ordered at the moment of the first incident. Rather, the issue is whether the delay in ordering the CT scan caused Blake to suffer damages he would not have otherwise suffered, or lessened his chances of a better result.
In its reasons for judgment, the trial court noted that irrespective of whether the nurses were negligent, the evidence did not show that it would have made any difference in Blake’s condition. There is a reasonable factual basis in the record for this finding of a lack of causation.
. Dr. Rashidi was asked if the nine-hour delay in ordering the CT scan changed any of Blake’s treatment or affected his outcome. Dr. Rashidi replied that one could not say for sure, and probably not. Dr. Rashidi, who is a neurosurgeon who treated Blake at LSU, is as independent an expert witness as one is going to find in this record. We also note that neither Dr. Katz nor Dr. Pena-Miches was able to say how much worse Blake’s condition was made by the delayed diagnosis at HMH. Also to be considered is that HMH is a rural hospital, and it is not clear how quickly the desired results would have been obtained if the CT scan had been ordered in the middle of the night. As it was, it took some time on Tuesday for the transfer to LSU to be accomplished. Finally, we must recognize that Blake was at LSU for nearly 24 hours before the shunt was successfully placed.
119The trial court’s finding that HMH is not liable for any negligence in this case is not clearly wrong or manifestly erroneous. The judgment dismissing Blake’s and Moore’s claims against the Town of Homer d/b/a Homer Memorial Hospital, is affirmed.
DECREE
At appellants’ costs, the judgment is AFFIRMED.

. Blake presented there on January 9, 2002, with complaints of lower back pain due to a recent fall. He was discharged that same day.
Blake went there on March 30, 2003, with complaints of abdominal pain that started that afternoon. He explained that he normally had that type of pain when he was upset, and he was upset about going to his father’s house the next day. He was discharged that night after being given a GI cocktail along with other drugs
On April 13, 2003, Blake presented there with complaints of mid-upper abdominal pain for three weeks. His mother said he had been vomiting blood for one week. He was discharged later that day.

. This was an attempt to place a catheter in the brain to relieve pressure. It is not the same as a shunt, but it basically has the same function.

. Patsy McHan, a nurse consultant, testified on behalf of plaintiffs. She testified that Mills should not have ignored Moore’s reports of seizures just because Mills did not see them occur. In light of the reports of seizures and Blake’s prior symptoms of nausea and vomiting, grogginess, and headaches, McHan believed that Mills should have alerted the on-call doctor.

. Dr. Pena-Miches had reviewed records for plaintiffs’ counsel in several prior cases.

. He estimated that he has worked on 20-30 cases for plaintiffs’ counsel.

. He assumed that Dr. Smith had knowledge of the changes in Blake's condition.